## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

BELLSOUTH
TELECOMMUNICATIONS, LLC
d/b/a AT&T NORTH CAROLINA
and d/b/a AT&T SOUTH
CAROLINA,

Case No. 23-1010

Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED
STATES OF AMERICA,

Respondents.

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, Federal

Rule of Appellate Procedure 15(d), and D.C. Circuit Rule 15, BellSouth

Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South

Carolina ("AT&T") hereby petitions for review of the Federal Communications

Commission's *Order on Reconsideration and Review*, FCC 22-90 (Proceeding No.

20-293, Bureau ID No. EB-20-MD-004) (the "Order").  The Order was adopted by

the Federal Communications Commission on November 17, 2022 and released on

November 18, 2022.  The public (redacted) version the Order is attached hereto as

Exhibit A.

Venue is proper in this Court under 28 U.S.C. § 2343, which permits petitions for review to be filed "in the United States Court of Appeals for the District of Columbia Circuit."

The Order resolves a pole attachment complaint that AT&T filed against Duke Energy Progress, LLC ("Duke") seeking just and reasonable pole attachment rates under 47 U.S.C. § 224 and refunds of prior overpayments. The Order applies pole attachment regulations that the Federal Communications Commission adopted in 2011 and amended in 2018 in order to eliminate outdated and artificial rate disparities between the pole attachment rental rates that electric utilities, like Duke, charge incumbent local exchange carriers, like AT&T, and their competitors for use of space on a utility pole. The statute guarantees incumbent local exchange carriers and their competitors "just and reasonable" pole attachment rates. *See* 47 U.S.C. § 224(b). The Commission's regulations include a presumption that incumbent local exchange carriers must be charged the same just and reasonable pole attachment rate that is guaranteed their competitors, which is known as the new telecom rate. 47 C.F.R. § 1.1413(b). The statute and the Commission's regulations strictly limit the circumstances in which an electric utility may charge a rate higher than the new telecom rate and restrict the rate formula inputs that may be used to calculate the just and reasonable rate.

AT&T is adversely affected by certain parts of the Order because the

Federal Communications Commission granted AT&T's pole attachment complaint only *in part*, which denied AT&T the full relief it sought.  In particular, the Order requires AT&T to pay a substantially higher rate for use of Duke's poles than the just, reasonable, and fully compensatory new telecom rate AT&T's competitors pay for use of comparable space on the same utility poles.

AT&T seeks review of the Order to the extent that it denied AT&T the relief AT&T sought on the grounds that those parts of the Order are inconsistent with 47 U.S.C. § 224, violate the Administrative Procedures Act, and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

AT&T respectfully requests that this Court hold unlawful, vacate, enjoin, and/or set aside those portions of the Order that deny AT&T the relief it sought and provide such additional relief as may be just and proper.

Respectfully submitted,

*/s/ Claire J. Evans*
Claire J. Evans
Christopher S. Huther
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
cevans@wiley.law
chuther@wiley.law

*Counsel for Petitioner*
*BellSouth Telecommunications, LLC*
*d/b/a AT&T North Carolina and*
*d/b/a AT&T South Carolina*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| BELLSOUTH TELECOMMUNICATIONS, LLC d/b/a AT&T NORTH CAROLINA and d/b/a AT&T SOUTH CAROLINA,<br><br>                    Petitioner,<br><br>          v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>                    Respondents. | Case No. 23-1010 |

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina ("AT&T") hereby submits the following corporate disclosure statement:

AT&T, a Georgia limited liability company with its principal place of business in Atlanta, Georgia, is an incumbent local exchange carrier that provides telecommunications and other services in North Carolina and South Carolina using facilities attached to utility poles owned by Duke Energy Progress, LLC. AT&T is wholly owned by BellSouth, LLC.

BellSouth LLC's sole member is AT&T DataComm, LLC.

AT&T DataComm, LLC's sole member is AT&T DataComm Holdings, Inc.

AT&T DataComm Holdings, Inc. is wholly owned by AT&T Inc.

AT&T Inc. is a publicly traded company and no publicly held corporation owns 10% or more of the stock of AT&T Inc.

/s/ Claire J. Evans
Claire J. Evans
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
cevans@wiley.law

*Counsel for Petitioner*
*BellSouth Telecommunications, LLC*
*d/b/a AT&T North Carolina and*
*d/b/a AT&T South Carolina*

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Appellate Procedure 15(c) and Circuit

Rule 25(d), I hereby certify that I electronically filed the foregoing Petition for

Review and served a copy as follows:

Eric B. Langley
Robin F. Bromberg
R. Rylee Zalanka
Langey & Bromberg LLC
2700 U.S. Highway 280, Suite 350E
Birmingham, AL 35223
Counsel for Duke Energy Progress,
LLC
(by U.S. mail, postage prepaid)

Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(by U.S. mail, postage prepaid)

P. Michele Ellison
General Counsel
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554
LitigationNotice@fcc.gov
(by email, pursuant to 47 C.F.R. § 1.13)

/s/ Claire J. Evans
Claire J. Evans
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
cevans@wiley.law

*Counsel for Petitioner
BellSouth Telecommunications, LLC
d/b/a AT&T North Carolina and
d/b/a AT&T South Carolina*

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | Proceeding No. 20-293 |
| | ) | Bureau ID No. EB-20-MD-004 |
| BellSouth Telecommunications, LLC | ) | |
| d/b/a AT&T North Carolina and | ) | |
| d/b/a AT&T South Carolina, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Duke Energy Progress, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON RECONSIDERATION AND REVIEW**

**Adopted:  November 17, 2022**                                        **Released:  November 18, 2022**

By the Commission:  Chairwoman Rosenworcel issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                                    Paragraph #

I.    INTRODUCTION ................................................................................................................... 1
II.   BACKGROUND ..................................................................................................................... 2
      A.  Legal Framework ............................................................................................................ 2
      B.  The Order ........................................................................................................................ 9
III.  WE DENY DUKE'S PETITION FOR RECONSIDERATION ON THE MERITS .......................... 10
      A.  We Affirm the Bureau's Rulings Regarding Application of the *2018 Order* ................................. 10
          1.  The Bureau correctly concluded that the JUA is reviewable under the rules adopted in
              the *2018 Order* ...................................................................................................... 10
          2.  The Bureau correctly applied the Old Telecom Rate as a "Hard Cap"—the maximum
              permissible rate that Duke may charge AT&T—for the timeframe covered by the
              *2018 Order* ............................................................................................................ 14
      B.  We Affirm the Bureau's Rulings Regarding Application of the *2011 Order* ................................. 17
          1.  The Bureau correctly concluded that the JUA is reviewable under the *2011 Order* for
              the period prior to January 1, 2020 ......................................................................... 17
          2.  The Bureau correctly concluded that AT&T is entitled to relief under the *2011 Order* ......... 24
          3.  The Bureau correctly held that AT&T is entitled to a rate that does not exceed the
              Old Telecom Rate for the period governed by the *2011 Order* .................................... 26
      C.  The Bureau Applied the Correct Statute of Limitations ................................................... 38
      D.  The Bureau Correctly Held That In Calculating the Rate, Duke May Not Charge AT&T
          for the Safety Space ...................................................................................................... 42

IV. WE DENY AT&T'S APPLICATION FOR REVIEW AND GRANT AT&T'S REQUEST
    FOR CLARIFICATION .................................................................................................. 45
    A. The Bureau Reasonably Determined that the JUA Provides AT&T with Benefits that
       Give Material Advantages Over Competitive Attachers on the Same Poles ................................. 46
    B. The Bureau Properly Relied on Duke's Comprehensive Survey to Determine the Rate
       Input for the Average Number of Attachers ................................................................ 55
    C. We Grant AT&T's Request for Clarification ................................................................ 56
V. ORDERING CLAUSES .................................................................................................. 57

## I.    INTRODUCTION

1.    In this Order on Reconsideration and Review, we address a Petition for Reconsideration filed by Duke Energy Progress (Duke), an electric utility,[1] and an Application for Review filed by BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina (collectively, AT&T), an incumbent local exchange carrier (LEC).[2]  Both parties challenge aspects of the Enforcement Bureau's (Bureau) September 21, 2021 Memorandum Opinion and Order in the above-captioned pole attachment complaint proceeding.[3]  The *Order* granted in part AT&T's pole attachment complaint against Duke in which AT&T alleged that the rates it pays for the use of Duke's poles are unjust and unreasonable under section 224 of the Communications Act of 1934, as amended (Act), and the Federal Communications Commission's (FCC or Commission) rules and orders.[4]  Based on our review of the record and the submissions before us, we deny the Duke Petition.  Further, we deny the AT&T Application on the merits, and we grant AT&T's request for clarification included with its Application.[5]

---

[1] *See* Duke Energy Progress, LLC's Petition for Reconsideration, Proceeding No. 20-293 (filed Oct. 21, 2021) (Petition or Duke Petition); *see also* Opposition of BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina to Duke Energy Progress's Petition for Reconsideration, Proceeding No. 20-293 (filed Nov. 1, 2021) (AT&T PFR Opposition); Duke Energy Progress, LLC's Reply to AT&T's Opposition to Petition for Reconsideration, Proceeding No. 20-293 (filed Nov. 8, 2021) (Duke PFR Reply).

[2] *See* Application for Review of BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina, Proceeding No. 20-293 (filed Oct. 21, 2021) (Application or AT&T Application); *see also* Duke Energy Progress, LLC's Opposition to AT&T's Application for Review, Proceeding No. 20-293 (filed Nov. 5, 2021) (Duke AFR Opposition); Reply in Further Support of the Application for Review Filed By BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina, Proceeding No. 20-293 (filed Nov. 15, 2021) (AT&T AFR Reply).

[3] *See BellSouth Telecomm., LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina*, Proceeding No. 20-293, Memorandum Opinion and Order, 36 FCC Rcd 13684 (EB 2021) (*Order*); 47 CFR §§ 1.106, 1.115.

[4] *Order*, 36 FCC Rcd at 13687, para. 8; *see also* Pole Attachment Complaint of BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina, Proceeding No. 20-293 (filed Sept. 1, 2020) (Complaint); 47 U.S.C. § 224; 47 CFR § 1.1413.

[5] *See* AT&T Application at 21-22.  In this case, the Bureau has elected to refer the issues raised in the Duke Petition to the Commission for resolution pursuant to Commission rules 1.104(b) and 1.106(a)(1).  *See* 47 CFR §§ 1.104(b), 1.106(a)(1).  In addition, because the Duke Petition and the AT&T Application raise overlapping issues, we address both filings here in the interest of administrative efficiency.  Consistent with rule 1.104(c), we take final action upon the Petition prior to the Application.  *See* 47 CFR § 1.104(c) ("If in any matter one party files a petition for reconsideration and a second party files an application for review, the Commission will withhold action on the application for review until final action has been taken on the petition for reconsideration."); *see also Mobex Network Services, LLC*, Memorandum Opinion and Order, 25 FCC Rcd 3390, 3394 n.34 (2010) (addressing petition for reconsideration prior to application for review consistent with 47 CFR § 1.104(c)).

## II.    BACKGROUND

### A.    Legal Framework

2.    Section 224(b)(1) of the Act requires the Commission to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable."[6] Section 224(e) requires the Commission to establish a methodology to calculate the pole attachment rates to be paid by telecommunications carriers when the parties fail to resolve a dispute over such rates, and further specifies that such regulations ensure that a utility charges rates that are "just, reasonable, and nondiscriminatory."[7]  In 1998, the Commission adopted rules implementing section 224(e) and establishing a methodology for calculating pole attachment rates for telecommunications carriers.[8]

3.    In the *2011 Pole Attachment Order*,[9] the Commission reexamined the methodology for calculating the pole attachment rate applicable to competitive LECs,[10] resulting in a revised rate (the New Telecom Rate) that is lower than the pre-existing rate (the Old Telecom Rate)[11] and more closely approximates the rate that cable operators pay (the Cable Rate).[12]  The Commission also concluded that section 224(b) authorized it to regulate the rates, terms, and conditions of incumbent LEC pole attachments.[13]  The Commission explained that, while in the past, incumbent LECs were positioned to

---

[6] 47 U.S.C. § 224(b)(1).

[7] *See id.* § 224(e).

[8] *Implementation of Section 703(e) of the Telecommunications Act, Amendment of the Commission's Rules and Policies Governing Pole Attachments*, CS Docket No. 97-151, Report and Order, 13 FCC Rcd 6777 (1998) (*1998 Implementation Order*), *aff'd in part, rev'd in part, Gulf Power v. FCC*, 208 F.3d 1263 (11th Cir. 2000) (*Gulf Power v. FCC*), *rev'd, Nat'l Cable & Telecomms. Ass'n v. Gulf Power*, 534 U.S. 327 (2002) (*Gulf Power*).

[9] *See Implementation of Section 224 of the Act*, WC Docket No. 07-245, Report and Order and Order on Reconsideration, 26 FCC Rcd 5240 (2011) (*2011 Order* or *2011 Pole Attachment Order*), *aff'd, American Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013) (*American Elec. Power v. FCC*).

[10] We use the term "competitive LEC" herein as a shorthand for the statutory category of "telecommunications carrier," defined in section 224(a)(5), which excludes incumbent LECs.  We note, however, that the definition of "telecommunications carrier" in section 224(a)(5) includes carriers other than competitive local exchange carriers (LECs) (e.g., interexchange carriers and CMRS providers).  The shorthand notation used here should not be construed as limiting in any way the statutory rights available to all providers that qualify as telecommunications carriers under section 224(a)(5).  *See* 47 U.S.C. § 224(a)(5).

[11] *See 2011 Order*, 26 FCC Rcd at 5244, para. 8.  In the *2011 Order*, the Commission referred to the competitive LEC rate that was in effect prior to that order as the "pre-existing, high-end telecom rate."  *See, e.g.*, *2011 Order*, 26 FCC Rcd at 5337, para. 218 & n.661.  For ease of reference, we refer to that rate as the "Old Telecom Rate."  The New Telecom Rate, like the Old Telecom Rate, governs pole attachments by competitive LECs and by cable operators providing telecommunications services.  *See* 47 CFR § 1.1406(d)(2) (New Telecom Rate formula); 47 CFR § 1.1409(e)(2) (2010) (Old Telecom Rate formula).

[12] *See 2011 Order*, 26 FCC Rcd at 5244, para. 8.  The Cable Rate applies to attachments to poles by cable operators providing cable services.  *See* 47 U.S.C. § 224(d)(3); 47 CFR § 1.1406(d)(1). The Commission took further steps in 2015 to harmonize the Old Telecom Rate and the Cable Rate.  *See Implementation of Section 224 of the Act*, WC Docket No. 07-245, Order on Reconsideration, 30 FCC Rcd 13731 (2015) (*2015 Implementation Recon Order*); *Erratum*, FCC 15-151 (Feb. 8, 2016).

[13] *See 2011 Order*, 26 FCC Rcd at 5327-33, paras. 199-213.  After reexamining the language and structure of section 224, the Commission held in the *2011 Order* that the definition of "pole attachment" under section 224(a)(4) includes pole attachments of incumbent LECs.  Based on this interpretation, the Commission concluded that section 224(b), which requires it to regulate the rates, terms, and conditions for *pole attachments*, includes a duty to regulate incumbent LEC pole attachments.  *See id.* at 5331-32, paras. 209-11 (holding that "incumbent LECs are entitled to pole attachment rates, terms and conditions that are just and reasonable pursuant to Section 224(b)(1)"); *see also id.* at 5243-44, 5327-28, 5330, paras. 8, 202, 208.  Unlike cable and competitive LEC attachers, however, the

(continued....)

negotiate just and reasonable attachment agreements because they owned roughly as many poles as the electric utilities, incumbent LEC pole ownership had declined over time and "may have left incumbent LECs in an inferior bargaining position."[14]  According to the Commission, incumbent LEC attachment rates were, in aggregate, significantly higher than cable rates, so that incumbent LECs were at a competitive disadvantage, particularly with respect to broadband and other advanced service offerings.[15]  The Commission determined that oversight of incumbent LEC attachment rates would promote broadband deployment, given that "the rates charged for pole access are likely to affect deployment decisions for all telecommunications carriers, including incumbent LECs."[16]

4.    Having determined that section 224(b) authorized it to regulate incumbent LEC pole attachment rates, terms, and conditions, the Commission sought to do so "in a manner that accounts for the potential differences between incumbent LECs and telecommunications carrier or cable operator attachers."[17]  The Commission reasoned that incumbent LECs frequently obtain access to electric utility poles through joint use agreements, which differ from cable company and competitive LEC attachment agreements in that they are typically "structured as cost-sharing arrangements" and arguably provide incumbent LECs advantages not found in competitive LEC and cable company agreements.[18]  Thus, the Commission stated that it "question[ed] the need to second guess" such arrangements and opined that it would be "unlikely to find the rates, terms and conditions in existing joint use agreements unjust or unreasonable."[19]  The Commission also noted that the record indicated that incumbent LECs and other utilities have the ability to terminate existing agreements and seek new arrangements.[20]  Nonetheless, if an incumbent LEC demonstrated that it "genuinely lacks the ability to terminate an existing agreement [i.e., one entered into before the *2011 Order*] and obtain a new arrangement[,]" the Commission concluded that it could take such evidence into consideration in a complaint proceeding examining the rates, terms, and conditions in that agreement.[21]

5.    Regarding new agreements, the Commission concluded that if an incumbent LEC could show that such a "new" agreement provides access to poles on terms and conditions that are "comparable to" or do not "provide a material advantage [over]" competitive LEC or cable company agreements with the same electric utility, "competitive neutrality counsels in favor of affording incumbent LECs the same

(Continued from previous page) ───────────────
Commission continued to hold that incumbent LECs have no right of access to utilities' poles pursuant to section 224(f)(1).  *See id.* at 5328, 5329-30, 5332-33, paras. 202, 207, 212 & n.643.

[14] *Id.* at 5327, para. 199.

[15] *See id.* at 5330-31, para. 208.

[16] *Id.* at 5330, para. 208; *see also id.* at 5241, para. 1 (revising the pole attachment rules will "promote competition and increase the availability of robust, affordable telecommunications and advanced services to consumers").

[17] *Id.* at 5333, para. 214.  The Commission did not establish a specific rate formula for incumbent LEC attachers, choosing instead to resolve incumbent LEC complaints "on a case-by-case basis."  *Id.* at 5334, para. 214.

[18] *See id.* at 5334, 5335, 5337, paras. 216, 218 & nn.651, 654; *see also id.* at 5337, para. 218 (noting that the Old Telecom Rate is "a higher rate than the regulated rate available to telecommunications carriers and cable operators" and therefore "it helps account for particular arrangements that provide net advantages to incumbent LECs relative to cable operators or telecommunications carriers").

[19] *Id.* at 5335, para. 216.

[20] *Id.* at 5335, para. 216 & n.655.

[21] *Id.* at 5336, para. 216.  *See Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Third Report and Order and Declaratory Ruling, 33 FCC Rcd 7705, 7768, para. 124 & n.466 (2018) (*2018 Order* or *2018 Pole Attachment Order*) (the *2011 Order* "placed the burden on incumbent LECs to rebut the presumption that they are not similarly situated to an existing telecommunications attacher in order to obtain access on rates, terms, and conditions that are comparable to the existing telecommunications attacher" (citing *2011 Order*, 26 FCC Rcd at 5336, para. 217)).

rate as the comparable provider."[22] Conversely, if a new agreement includes pole access terms and conditions that "materially advantage" the incumbent LEC in relation to competitive LEC or cable company attachers, the Commission found it "reasonable to look to the [Old Telecom Rate] as a reference point" in resolving such complaint proceedings.[23]

6.      In the *2018 Pole Attachment Order*, the Commission observed that incumbent LECs' "bargaining power vis-à-vis utilities has continued to decline."[24] Citing evidence that "incumbent LEC pole ownership has declined and incumbent LEC pole attachment rates have increased (while pole attachment rates for cable and telecommunications attachers have decreased)[,]" the Commission reconsidered the basis for the presumption in the *2011 Order* that incumbent LECs differ from and have superior bargaining power vis-à-vis other attachers.[25]

7.      In view of declining levels of incumbent LEC pole ownership and a widening disparity in pole attachment rates, the Commission adopted a new rebuttable presumption that "for new and newly-renewed pole attachment agreements" between incumbent LECs and electric utilities,[26] incumbent LECs "are similarly situated" to "telecommunications attachers" and thus are entitled to "comparable" rates that are no higher than the New Telecom Rate.[27] The Commission held that a utility can rebut this presumption "with clear and convincing evidence that [an] incumbent LEC receives net benefits under its pole attachment agreement with the utility that materially advantage the incumbent LEC over other telecommunications attachers."[28]

8.      In cases where a utility rebuts this presumption, the Commission designated the Old Telecom Rate as "the maximum rate that the utility and incumbent LEC may negotiate."[29] Thus, whereas the *2011 Order* had instructed that the Old Telecom Rate be used as a "reference point" in complaint proceedings involving an incumbent LEC attacher that is not similarly situated to other attachers on a utility's poles,[30] the *2018 Order* made this rate a "hard cap" in order to "provide further certainty within

---

[22] *2011 Order*, 26 FCC Rcd at 5336, para. 217.

[23] *Id.* at 5336-37, para. 218.

[24] *See 2018 Order*, 33 FCC Rcd at 7769, para. 126.

[25] *Id.* at 7767-69, paras. 123-26; *see also id.* at 7769, para. 125 (citing a "recent [USTelecom] member survey" showing that its incumbent LEC members' average annual pole attachment rate paid to investor-owned utilities had increased from $26.00 to $26.12 since 2008 in Commission-regulated states, while cable and competitive LEC provider payments to incumbent LECs, which were averaging $3.00 and $3.75 per year, respectively, had decreased from their 2008 levels of $3.26 and $4.45, respectively) (internal citation omitted).

[26] *2018 Order*, 33 FCC Rcd at 7769, para. 126. A "new or newly-renewed" agreement is "one entered into, renewed, or in evergreen status after the effective date of [the *2018 Order*], and renewal includes agreements that are automatically renewed, extended, or placed in evergreen status." *Id.* at 7770, para. 127 n.475.

[27] *Id.* at 7769, para. 126 (establishing a rebuttable presumption that an incumbent LEC that is a party to a new or "newly-renewed" agreement is "similarly situated" to competitive LEC attachers and therefore entitled to the same rate (i.e., the New Telecom Rate)); *see* 47 CFR § 1.1413(b). This presumption became effective on March 11, 2019. *See Accelerating Broadband Deployment by Removing Barriers to Infrastructure Investment*, 84 Fed. Reg. 2460, 2460 (Feb. 7, 2019) (establishing effective date of rate presumption rule revisions). A separate effective date of May 20, 2019 applied to 2018 rule revisions governing pole attachment access and "one-touch-make-ready" requirements, which are not at issue here. *See Accelerating Wireline Deployment by Removing Barriers to Infrastructure Investment*, 84 Fed. Reg. 16412, 16413 (Apr. 19, 2019) (establishing effective date of pole attachment access rule revisions). For ease of reference, our use of the phrase "*2018 Order* effective date," or similar formulations, refers to the March 11, 2019 effective date of the rate presumption rule revisions.

[28] *See 2018 Order*, 33 FCC Rcd at 7768, para. 123; *see also* 47 CFR § 1.1413(b).

[29] *2018 Order*, 33 FCC Rcd at 7771, para. 129; *see also 2011* Order, 26 FCC Rcd at 5300, para. 141 (stating that the Old Telecom Rate formula serves as the "upper bound" of the range of reasonable rates).

[30] *2011 Order*, 26 FCC Rcd at 5337, para. 218.

the pole attachment marketplace" and "limit pole attachment litigation."[31]  In complaint proceedings regarding agreements that materially advantage an incumbent LEC, and that were entered into *after* the effective date of the *2011 Order* but *before* the effective date of the *2018 Order* (March 11, 2019), the Commission determined that the Old Telecom Rate will continue to serve as a reference point.[32]

### B.     The Order

9.     AT&T and Duke are parties to a Joint Use Agreement (JUA) that contains the rates, terms, and conditions for each party's use of the other's utility poles.[33]  In the *Order*, the Bureau found that the rates that AT&T pays under the JUA to attach to Duke's poles are "unjust and unreasonable" under section 224 and the Commission's *2011* and *2018 Orders*.[34]  At the same time, the Bureau concluded that the JUA provides AT&T with benefits that materially advantage it compared to other attachers on the same poles[35] and AT&T therefore is not entitled to the New Telecom Rate.[36]  The Bureau held that AT&T is entitled to a pole attachment rate that does not exceed the Old Telecom Rate, covering the entire timeframe at issue.[37]

## III.     WE DENY DUKE'S PETITION FOR RECONSIDERATION ON THE MERITS

### A.     We Affirm the Bureau's Rulings Regarding Application of the *2018 Order*

#### 1.     The Bureau correctly concluded that the JUA is reviewable under the rules adopted in the *2018 Order*

10.     In the *Order*, the Bureau held that the JUA automatically renewed and extended each year after January 1, 2001, and is thus subject to rules adopted in the *2018 Order* for the period following the JUA's renewal on January 1, 2020.[38]  Duke challenges this holding, arguing that the Bureau failed to address Duke's arguments below that "renewal" under the *2018 Order* (i) requires some additional "voluntary action by the parties[,]" and (ii) cannot be established without a corresponding "right of termination."[39]

11.     Duke's assertion that renewal of the JUA required some unspecified, additional action by the parties is incorrect.[40]  As the Bureau noted, the rebuttable presumption regarding an incumbent LEC's

---

[31] *2018 Order*, 33 FCC Rcd at 7771, para. 129.

[32] *Id.* at 7770, para. 127 n.475; *see also id.* at 7770, para. 127 n.478 (noting that "for existing agreements, the [*2011 Order'*s] guidance regarding review of incumbent LEC pole attachment complaints will continue to apply") (citing *2011 Order*, 26 FCC Rcd at 5333-38, paras. 214-19).

[33] *See Order*, 36 FCC Rcd at 13685, para. 3.  Predecessors of AT&T and Duke were parties to a prior joint use agreement dated September 29, 1977 (1977 JUA).  *Id.* at 13685, para. 3 & n.6.

[34] *See Order*, 36 FCC Rcd at 13687, para. 8.

[35] *See id.* at 13690-700, 13703-07, paras. 16-35, 41-47.

[36] *See id.* at 13687, para. 8.

[37] *See id.* at 13700, 13707, paras. 35, 47.

[38] *See id.* at 13687-88, 13689-90, paras. 9-10, 12-14.

[39] Petition at 8-9.

[40] We also reject Duke's assertion that the Commission lacks jurisdiction under section 224 to regulate the rates, terms and conditions of AT&T's attachments to Duke's poles.  *See* Petition at 25.  As noted in *Verizon Maryland*, two circuit courts of appeal have upheld the Commission's authority under section 224 to set just and reasonable rates for incumbent LECs.  *See Verizon Maryland LLC v. The Potomac Edison Company*, Proceeding No. 19-355, Memorandum Opinion and Order, 35 FCC Rcd 13607, 13612 n.43 (2020) (*Verizon Maryland*) (citing *City of Portland v. United States*, 969 F.3d 1020, 1052-53 (9th Cir. 2020) and *American Elec. Power v. FCC*, *supra* note 9,

(continued….)

rates in rule 1.1413(b) applies to pole attachment contracts "entered into or *renewed* after the effective date of this section[,]" and "renewal" under the *2018 Order* "includes agreements that are *automatically* renewed, extended, or placed in evergreen status."[41]  Article XVII of the JUA provides that the agreement "shall continue in force until terminated [with respect to additional attachments] by either party" upon one year's notice to the other party.[42]  The Commission has consistently found that "continue" and "extend" are synonymous in this context.[43]  Neither party provided notice of termination.  The Bureau thus correctly concluded that the JUA has automatically renewed on January 1st each year since its January 1, 2001 effective date.[44]  Contrary to Duke's contention, no additional action by the parties was required for renewal of the JUA.[45]

12.     The same analysis applies to Duke's additional argument that there can be no "renewal" without a "right of termination."[46]  We agree with the Bureau that "nothing in the *2018 Order* suggests that an express right to terminate is required," because, again, "renewal" under the *2018 Order* "includes agreements that are automatically renewed, extended, or placed in evergreen status."[47]  This determination also accords with *Verizon Maryland*, where the Commission held that a joint use agreement with no express unilateral termination right as to existing attachments was "newly renewed and extended."[48]

13.     Thus, the Bureau properly determined that the JUA automatically renewed and extended, within the meaning of rule 1.1413(b) and the *2018 Order*, on January 1st each year, and that the *2018 Order* provides the relevant standard for reviewing the JUA as of January 1, 2020, the date of the first automatic renewal after the *2018 Order*'s effective date.

(Continued from previous page) ————————————————

at 188); *see also Gulf Power*, *supra* note 8, at 335-36 (Section 224(e)(1) "work[s] no limitation" on the FCC's more general ratemaking authority under section 224(b)(1)).

[41] *See Order*, 36 FCC Rcd at 13687, para. 9 & n.23 (citing *2018 Order*, 33 FCC Rcd at 7770, para. 127 & n.475) (emphases added).

[42] *See* JUA, Art. XVII.A, B at 12.

[43] *See Order*, 36 FCC Rcd at 13687, para. 9 & n.26 (citing *BellSouth Telecomms., LLC d/b/a AT&T Florida v. Duke Energy Florida, LLC*, Proceeding No. 20-276, Memorandum Opinion and Order, DA 21-1008, 2021 WL 4170563, at *5, para. 15 (EB 2021) (*AT&T v. DEF*) (citing *Verizon Maryland*, 35 FCC Rcd at 13613, paras. 15-16 (joint use pole attachment agreement that continued in force until terminated upon one year's notice was held to have automatically renewed each year on January 1st and thus automatically renewed on January 1, 2020, "the first automatic renewal date after the effective date of the *[2018] Order*")).

[44] *Order*, 36 FCC Rcd at 13687-88, paras. 9-10.  In adopting this finding, the Bureau properly relied upon the Commission's analysis in *Verizon Maryland*.  *See id.* at 13688, para. 10 & n.28 (citing *Verizon Maryland*, 35 FCC Rcd at 13613, para. 16 & n.49).

[45] Petition at 8-9.

[46] Petition at 8.

[47] *See Order*, 36 FCC Rcd at 13689, para. 12 (citing *2018 Order*, 33 FCC Rcd at 7770, para. 127 n.475); Petition at 8.  Of course, as the Bureau has noted, "even an evergreen contract can be terminated by mutual agreement of the parties; thus the JUA permits AT&T and Duke to terminate the agreement, even as to existing attachments, if they both agree to that."  *See Order* 36 FCC Rcd at 13689, para. 12 n.41 (citing *AT&T v. DEF*, 2021 WL 4170563, at *6, para. 18 n.61).  Unless or until the parties act to terminate the JUA by mutual agreement, the JUA effectively renews and extends as to existing attachments as well.

[48] *See Order*, 36 FCC Rcd at 13689, para. 12 & n.41 (citing *Verizon Maryland*, 35 FCC Rcd at 13611, 13612-13, paras. 10, 15-18); *accord AT&T v. DEF*, 2021 WL 4170563, at *6, para. 18 (noting that "nothing in the text or structure of the rules or the *2018 Order* suggests that an express right to terminate with respect to existing attachments is required").  Finally, as the Bureau noted in *AT&T v. DEF*, "insulating the attachments at issue here from the benefits of the presumption that yields greater parity between incumbent LECs and cable operators would run contrary to the incentives for new broadband deployment that the Commission sought to foster through its adoption of that rule in the *2018 Order*."  *See AT&T v. DEF*, 2021 WL 4170563, at *6, para. 18.

2. **The Bureau correctly applied the Old Telecom Rate as a "Hard Cap"—the maximum permissible rate that Duke may charge AT&T—for the timeframe covered by the *2018 Order***

14.    For the rate period governed by the *2018 Order*, the *Order* held that AT&T is entitled to a rate that does not exceed the Old Telecom Rate.[49]  Duke seeks reconsideration of the Bureau's use of the Old Telecom Rate as a "hard cap" in light of what Duke identifies as "the benefits provided to AT&T under the JUA[,]" "the corresponding cost to [Duke] of providing those benefits[,]" and the "unrefuted" evidence showing the value of those benefits to AT&T."[50]  Duke's arguments are meritless.  As previously noted, the *2018 Order* established a presumption that an incumbent LEC may be charged a rate no higher than the New Telecom Rate for agreements entered into or renewed after the March 11, 2019 effective date of that order, unless the utility demonstrates "with clear and convincing evidence that the incumbent [LEC] receives benefits . . . that materially advantage[] [it] over other telecommunications [service providers] on the same poles."[51]  Where the utility makes that showing, the Old Telecom Rate is the maximum permissible rate.[52]  Having determined that the JUA provides AT&T with benefits that give it a material advantage over competitive LEC and cable attachers on the same poles, the Bureau correctly concluded that AT&T is entitled to a rate, as of January 1, 2020, that does not exceed the Old Telecom Rate.[53]

15.    Duke's additional claims also fail.  Duke asserts that it cannot recoup the cost of providing certain benefits to AT&T under the JUA if the rate is capped at the Old Telecom Rate, and that the imposition of this cap will be "confiscatory" under the Fifth Amendment.[54]  However, the rate formula largely uses Duke's costs as inputs[55] and is applied in this context to account for "particular arrangements that provide net advantages to incumbent LECs" such as AT&T.[56]  The Commission's Old Telecom Rate formula "is based on a fully allocated cost methodology, which recovers costs that the pole owner incurs regardless of the presence of attachments."[57]  As such, it provides just compensation.[58]  Indeed, the

---

[49] *See Order*, 36 FCC Rcd at 13690, para. 15; *see also* 47 CFR § 1.1409(e)(2) (2010).

[50] Petition at 19-20 (arguing that using the Old Telecom Rate as a "hard cap" "violates the Pole Attachments Act" and is "confiscatory" under the Fifth Amendment).

[51] *See* 47 CFR § 1.1413(b); *see also 2018 Order*, 33 FCC Rcd at 7769-71, paras. 126-28.  Duke provided the pole attachment agreements of competitive LEC, cable company, and wireless licensees that attach to the same Duke poles as those to which AT&T attaches under the JUA.  *See Order*, 36 FCC Rcd at 13690, para. 15 n.46.

[52] *2018 Order*, 33 FCC Rcd at 7771, para. 129 (where the presumption is rebutted "the pre-*2011 Pole Attachment Order* telecommunications carrier rate [i.e., the Old Telecom Rate] is the maximum rate"); *Accelerating Wireline and Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 83 Fed. Reg. 46812, 46828 (Sept. 14, 2018).

[53] *See Order*, 36 FCC Rcd at 13690-91, paras. 15-16.

[54] Petition at 19-20.

[55] *See Order*, 36 FCC Rcd at 13707-11, paras. 48-57; *see also Verizon Maryland LLC v. The Potomac Edison Co.*, Proceeding No. 19-355, Order on Reconsideration, FCC 22-26, 2022 WL 990572, at *5, para. 13 n.55 (2022) (*Verizon Maryland Recon Order*) ("The Commission's pole attachment rate orders make it clear that the Commission's pole attachment rate formulas take account of the utility's costs.") (citing *2011 Order*, *2018 Order*, and *2015 Implementation Recon Order*, 30 FCC Rcd 13731); *Bellsouth Telecomms., LLC v. Florida Power & Light*, Proceeding No. 19-187, Memorandum Opinion and Order, 36 FCC Rcd 253, 257, para. 13 & nn.36-37 (EB 2021) (*AT&T v. FPL II*) (noting that the utility "will be compensated for its investment because the Old Telecom Rate formula requires the attacher to pay its share of the utility's 'net cost of a bare pole,'" which is derived from FERC account 364 and which, in turn, "'include[s] the cost installed of poles'") (citations omitted).

[56] *Verizon Maryland Recon Order,* 2022 WL 990572, at *6, para. 16 & n.69 (quoting *2018 Order*, 33 FCC Rcd at 7771, para. 129 & n.483).

[57] *2011 Order*, 26 FCC Rcd at 5300, para. 141 (internal citation omitted).

Commission observed in the *2011 Order* that "[l]egal precedent has established that a pole attachment rate above marginal cost"—a measure that is *less* than the fully allocated costs included in the Old Telecom Rate—"provides just compensation."[59]

16.     Finally, we reject Duke's request to reconsider use of the Old Telecom Rate as a "hard cap" under the *2018 Order* based on what it characterizes as "unrefuted" valuation evidence of the benefits afforded AT&T under the JUA in this case.[60]  First, the record reflects that AT&T did challenge the valuation evidence provided by Duke regarding, among other things, tabulated costs, inspection and engineering costs, right to remain on the poles, and the deployment of taller/stronger poles.[61]  Second, as we recently determined, the Commission has not "require[d] either party to calculate the dollar value of specific advantages provided under a JUA or prescribe[d] a methodology for such valuations."[62]

### B.     We Affirm the Bureau's Rulings Regarding Application of the *2011 Order*

### 1.     The Bureau correctly concluded that the JUA is reviewable under the *2011 Order* for the period prior to January 1, 2020

17.     After finding that the *2018 Order* governed the JUA upon its renewal on January 1, 2020, the Bureau examined whether AT&T was entitled to review of the JUA rates under the *2011 Order*.[63]  The Bureau found that the rates were subject to review under the *2011 Order* for the pre-January 1, 2020 period because AT&T demonstrated that it genuinely lacked the ability to terminate the JUA and obtain a new arrangement.[64]  Duke seeks reconsideration of that finding.[65]  For the reasons explained below, we

[58] *Id.* (noting that the Old Telecom Rate "serves as the upper end of the range of reasonable rates").

[59] *Id.* at 5300-01, para. 142 n.421 (citing *Alabama Power Co. v. FCC*, 311 F.3d 1357, 1370-71 (11th Cir. 2002) (*Alabama Power Co. v. FCC*)).  In *Alabama Power Co. v. FCC*, the court of appeals addressed an argument that the Cable Rate did not provide just compensation to electric utilities and resulted in an unconstitutional taking.  The court observed: "[B]efore a power company can seek compensation above marginal cost, it must show with regard to each pole that (1) the pole is at full capacity and (2) either (a) another buyer of the space is waiting in the wings or (b) the power company is able to put the space to a higher-valued use with its own operations. Without such proof, any implementation of the Cable Rate (which provides for much more than marginal cost) necessarily provides just compensation."  *See Alabama Power Co. v. FCC*, 311 F.3d at 1370-71*; see also City of Portland*, *supra* note 40, at 1053 (the Commission's decision in the *2018 Order* to set the Old Telecom Rate as the "maximum negotiable rate" "is not arbitrary or capricious . . . because [the] FCC set the rate at a value that is higher than both CLEC and cable operator rates, and the FCC had previously determined those rates were just, reasonable, and allowed full cost recovery") (citing *2018 Order*, 33 FCC Rcd at 7771, para. 129 & n.483; *2011 Order*, 26 FCC Rcd. at 5240, para. 183).

[60] Petition at 19-22.

[61] *See, e.g.*, Petition at 11-19; Reply, Exh. C, Reply Affidavit of Mark Peters (Peters Reply Aff.) at 4-21, paras. 6-34; *see also* AT&T PFR Opposition at 18 n.91.  To the extent that Duke contends that the Old Telecom Rate does not provide just compensation because it does not take full account of the value to AT&T of benefits provided under the JUA, we note that "in takings law, just compensation is determined by the loss to the person whose property is taken[,]" *see Alabama Power Co. v. FCC*, 311 F.3d at 1369 (citing *United States v. Causby*, 328 U.S. 256, 261 (1946)), and thus, "[t]he question is, What has the owner lost? not, What has the taker gained?"  *Id.*, 311 F.3d at 1369 (quoting *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 635 (1961) (internal quotations omitted)).

[62] *See Verizon Maryland Recon Order*, 2022 WL 990572, at *6, para. 16; *see also id.* at *5, paras. 13-15.

[63] *See Order*, 36 FCC Rcd at 13700, para. 36.  Under the applicable statute of limitations, the *Order* determined that AT&T was entitled to relief under the *2011 Order* for the period beginning September 1, 2017, which is three years from the date it filed the Complaint.  *Id.*, 36 FCC Rcd at 13714-15, para. 63.

[64] *See id.* at 13700-703, paras. 36-40.

[65] *See* Petition at 6-8 (quoting *2011 Order*, 26 FCC Rcd at 5336, para. 216).

affirm the Bureau's finding that AT&T has met this threshold requirement for review under the *2011 Order*.

18.     The *2011 Order* specifies that if an incumbent LEC that is a party to an "existing" joint use agreement (i.e., an agreement entered before the *2011 Order*) could demonstrate that it lacks the ability to terminate an agreement and negotiate a new arrangement, "the Commission can consider that as appropriate in a [pole attachment] complaint proceeding."[66] Here, the Bureau found that AT&T was unable to terminate the JUA and negotiate a lower rate based on the following factors: (1) the JUA does not include a termination date or allow AT&T to unilaterally terminate the JUA as to existing attachments; (2) the JUA prevents rate adjustments without Duke's consent; (3) AT&T occupies an "inferior bargaining position" because of "Duke's nearly five-to-one pole ownership advantage[;]" and (4) "protracted negotiations between the parties ha[d] failed to produce a mutually agreeable, just and reasonable rate."[67]

19.     Duke challenges the Bureau's conclusion that AT&T lacked the ability to terminate the JUA and negotiate a new arrangement as required by the *2011 Order*.[68] Duke first argues that "AT&T never sought to 'obtain a new arrangement' under the guidance of the *2011 Order*" and, instead, "waited until after the effective date of the *2018 Order* to ask about renegotiating rates."[69] Had AT&T sought to obtain a new arrangement prior to the effective date of the *2018 Order* and under the guidance of the *2011 Order*, Duke claims the negotiations would have been "entirely different."[70]

20.     Duke's argument is unavailing.  Nothing in the Commission's rules or orders required AT&T to request negotiations prior to the effective date of the *2018 Order* in order to secure review of the JUA rates under the *2011 Order*.  In fact, the *2018 Order* states explicitly that the *2011 Order*'s "guidance regarding review of incumbent LEC pole attachment complaints will continue to apply" to existing agreements pending renewal of those agreements—in this case, until the JUA renewed on January 1, 2020.[71] Indeed, as AT&T points out, the Commission has "decline[ed] the invitation . . . to modify [its] rules to preclude monetary recovery for any period prior to the time a utility receives actual notice of a disputed charge"[72] and, in the *2018 Order*, continued to require refunds of amounts unlawfully collected consistent with the relevant statute of limitations.[73]

---

[66] *2011 Order*, 26 FCC Rcd at 5335-36, para. 216.

[67] *See Order*, 36 FCC Rcd at 13700-701, para. 37 (internal quotations omitted).

[68] Petition at 6-8.

[69] *See* Petition at 6-7 (italics added); *see also* Duke PFR Reply at 4.

[70] Duke PFR Reply at 4.

[71] *2018 Order*, 33 FCC Rcd at 7770, para. 127 & n.478.  *See supra* Part III.A.1 (discussion of JUA renewal date).

[72] AT&T PFR Opposition at 11 & n.50 (quoting *2011 Order*, 26 FCC Rcd at 5290, para. 112).

[73] AT&T PFR Opposition at 11 & n.51 (citing 47 CFR § 1.1407(a)).  We agree with AT&T that Duke actually benefited from the timing of the negotiations because its "'liability for refunds is limited by the applicable [3-year] statute of limitations.'"  AT&T PFR Opposition at 11 & n.52 (quoting *Order*, 36 FCC Rcd at 13713, para. 61) (brackets in original).  We also reject Duke's claim that AT&T is "legally and contractually barred" under JUA Article XIII.D "from recovering relief for the period prior to its written notice requesting renegotiation of the pricing methodology."  Petition at 6-7 (citing JUA, Art. XIII.D).  JUA Article XIII.D states:  "Either party may make a request for review of the pricing methodology and the costs set forth in the Exhibits to this Agreement no sooner than at five (5) year intervals.  This request must be in writing and forwarded to the other party as specified in Article XVI."  *See* JUA, Art. XIII.D.  Assuming that the notice requirement specified in Article XIII.D applies to the negotiations that AT&T initiated on May 22, 2019 (a view that AT&T disputes), *see* AT&T PFR Opposition at 11 & n.52, Duke does not explain how that provision would preclude AT&T from obtaining refunds of amounts it previously paid Duke.  Nor does Duke explain why that provision would preclude AT&T from seeking a rate adjustment under a separate JUA provision—Article XIII.F—in accordance with the Commission's pole attachment

(continued….)

21.    Although Duke claims that the negotiations would have been "entirely different"[74] if initiated sooner, it offers no evidence to support this claim.[75]  According to Duke, AT&T's decision to begin negotiations after the effective date of the *2018 Order* allowed AT&T to take the unreasonable position that only the *2018 Order* presumptions (and not the *2011 Order* guidance) governed the entire timeframe at issue.[76]  While Duke suggests that AT&T's insistence on the *2018 Order* presumptions stymied the negotiations,[77] Duke fails to acknowledge that it also took aggressive negotiating positions that prevented the parties from reaching agreement.  As the Bureau noted, Duke insisted on "improperly allocating the safety space on Duke's poles to AT&T, and "refused to consider refunds for any prior period."[78]  Duke's attempt to portray AT&T as solely responsible for the parties' impasse is further undermined by Duke's failure to submit a settlement proposal during 15 months of pre-complaint negotiations, despite repeated requests from AT&T, and its refusal to provide copies of its license agreements so that AT&T could compare their terms with the JUA.[79]  We therefore reject Duke's contention that it was the timing of the negotiations, or AT&T's insistence on the *2018 Order* presumptions, that prevented the parties from negotiating a new arrangement.[80]

22.    Finally, Duke challenges the Bureau's finding that "Duke's substantial five-to-one pole ownership advantage, in combination with a relatively high attachment rate . . . supports an inference of AT&T's inferior bargaining position relative to Duke, and thus supports our decision to review the JUA's rates."[81]  Duke does not dispute its substantial pole ownership advantage and instead argues, as it did below, that to demonstrate disparate bargaining power, "AT&T [was required to have] prove[n] either: (1) that the JUA was unjust and unreasonable 'at the time it was executed;' or (2) that [Duke] 'subsequently wielded a growing pole ownership imbalance to its financial benefit.'"[82]  In the *Order*, the Bureau noted the absence of "Commission precedent" supporting Duke's arguments, and correctly determined that "[t]he issue is whether there is an imbalance of bargaining power today, when AT&T is attempting to terminate the JUA and negotiate a new agreement."[83]  As AT&T notes, "the Commission's statutory

(Continued from previous page) ───────────────────
rules and orders, along with a refund of past amounts paid in excess of a just and reasonable rate.  *See* JUA, Art. XIII.F ("Nothing in this Agreement shall preclude either party from the right to change the pole rental rate herein or other terms and conditions of this Agreement, in order to comply with the then current state or federal law and regulations of the applicable state regulatory agency, the Federal Communications Commission or the Federal Energy Regulatory Commission.").

[74] Duke PFR Reply at 4.

[75] As AT&T points out, "[Duke] does not claim it *would* have lowered its rates had AT&T asked to negotiate sooner, and the record refutes any such claim."  AT&T PFR Opposition at 11 (italics in original).

[76] *See* Petition at 7; Duke PFR Reply at 3-4.

[77] *See id.*

[78] *See Order*, 36 FCC Rcd at 13702, para. 39 & n.125 (quoting Reply Legal Analysis at 27).  *See also* Hatcher Answer Decl. at 9-10, para. 19 (in negotiations, Duke "made clear that retroactive refunds were a non-starter," and that "the parties likely were too far apart on methodology [for allocating pole costs] for further productive negotiations…."); *id.* at 9, para. 18 (AT&T's proposal that Duke bear the entire cost of the safety space was "a non-starter").

[79] *See Order*, 36 FCC Rcd at 13702, para. 39 & n.125; Peters Complaint Aff. at 3-5, paras. 7-9; Miller Complaint Aff. at 8, paras. 16-17; Complaint, Exhs. 8-17.

[80] *See Order*, 36 FCC Rcd at 13700-701, para. 37 & n.114.

[81] *See* Petition at 7-8 (quoting *Order*, 36 FCC Rcd at 13701-702, para. 38); *see also* Petition at 7 (arguing that AT&T has "made no . . . showing" of "disparity in bargaining power" stemming from relative pole ownership).

[82] *See* Petition at 7; *see also* Answer at 42-43, para. 26; Joint Statement at 3, Stipulated Fact No. 7.

[83] *Order*, 36 FCC Rcd at 13702, para. 38 n.123.

obligation is to ensure rates are just and reasonable *today* and, to that end, it decides whether JUA rates are subject to review under the [*2011 Order*] by looking to "whether there is an imbalance of bargaining power *today* . . . ."[84]  We agree and therefore reject Duke's attempt to limit rate relief to the situations it describes.[85]

23.      Based on our review of the record, we affirm the *Order*'s finding that AT&T demonstrated that it lacked the ability to terminate the JUA and obtain a new arrangement prior to filing the Complaint.  We therefore find that AT&T has met this threshold requirement for obtaining review of the JUA rates under the *2011 Order*.

### 2.      The Bureau correctly concluded that AT&T is entitled to relief under the *2011 Order*

24.      The Bureau correctly found that AT&T established a *prima facie* case that the JUA rates are unreasonable.  The ruling was based in part on evidence that the JUA rates are: (1) {[        ]} higher than both the Old and New Telecom Rates; (2) {[        ]} higher than the rates that AT&T charges competitive LECs and cable companies to attach to AT&T's poles; and (3) disproportionate to the amount of space AT&T and Duke each uses on the poles.[86]  Focusing on the third point, Duke argues that the Bureau erred in viewing the rate each party pays on a "proportional" "per-foot-of-space-occupied basis."[87]  We disagree.  In the *2011 Order*, the Commission found it appropriate to evaluate the justness and reasonableness of a rate sought by an incumbent LEC by considering whether it is "the same proportionate rate charged the electric utility, given the incumbent LEC's relative usage of the pole (such

---

[84] *See* AT&T PFR Opposition at 10 (italics in original).  Duke's claim that AT&T was required to show that Duke subsequently used a "growing pole ownership imbalance to its financial benefit" is likewise at odds with our precedent, which makes clear that a utility's pole ownership disparity need not be increasing where, as here, that disparity has continuously impacted an incumbent LEC's bargaining power vis-à-vis the utility.  *See, e.g.*, *Verizon Virginia v. Virginia Elect. & Power Co.*, Memorandum Opinion and Order, 32 FCC Rcd 3750, 3757, para. 13 n.53 (MDRD 2017) (noting that the Commission did not limit rate relief to those situations in which a pole ownership disparity was increasing, given that such a policy "would deny relief to incumbent LECs whose inferior bargaining positions have continuously impacted [their] ability to negotiate a just and reasonable rate over time").  Moreover, Duke does not dispute AT&T's claim that Duke's pole ownership advantage, in fact, has increased from approximately a 3-to-1 advantage in 1987 to approximately a 5-to-1 advantage today.  *See* AT&T PFR Opposition at 10.

[85] Duke argues that a typo in the *Order* where it mistakenly identified the date of the JUA as 1969 rather than 2000 resulted in a "substantive error because the Bureau then equate[d] the JUA rates to a vestige of the pre-competition 1970's."  Petition at 8 nn.33-35 (citing *Order*, 36 FCC Rcd at 13702, para. 38 n.123).  The Bureau's rationale, however, applies irrespective of the date of the JUA's execution—namely, that the relevant subject of the Commission's analysis is the present state of the parties' relationship and relative bargaining power "*today, when AT&T is attempting to terminate the JUA and negotiate a new agreement.*"  *See Order*, 36 FCC Rcd at 13702, para. 38 n.123 (italics supplied).  In addition, as the *Order* indicated, Duke's 5-to-1 pole ownership advantage is far greater than the pole ownership advantage found to have contributed to a utility's superior bargaining power in other pole attachment cases.  *See Order*, 36 FCC Rcd at 13701, para. 38 & n.122 (citing *Verizon Virginia*, 32 FCC Rcd at 3756-57, para. 13 (a utility's two-to-one pole ownership advantage, paired with a high rate, "constitutes probative evidence" of the incumbent LEC's inferior bargaining position relative to the utility); *Bellsouth Telecomms., LLC v. Florida Power & Light*, Proceeding No. 19-187, Memorandum Opinion and Order, 35 FCC Rcd 5321, 5331, para. 18 (EB 2020) (*AT&T v. FPL I*) (review of JUA rates appropriate where utility owned 66 percent of the parties' joint use poles, any rate change would have required the utility's consent, and the parties' efforts to negotiate new rates had failed)); *see also Verizon Maryland*, 35 FCC Rcd at 13617, para. 23 (noting that Potomac Edison's 4-to-1 pole ownership advantage likely places Verizon in "an inferior bargaining position") (internal citation omitted).

[86] *Order*, 36 FCC Rcd at 13704, para. 42 & nn.137-39.  Material set off by double brackets {[   ]} is confidential and is redacted from the public version of this document.

[87] Petition at 3-4.

as the same rate per foot of occupied space).”[88]  Duke also objects that in assessing the amount of space AT&T uses on the poles, the Bureau improperly used the one-foot space occupied presumption in rule 1.1410[89] for AT&T when AT&T “actually” occupies {[     ]} feet.[90]  But the {[     ]} feet figure is based on a survey that the Bureau considered and properly rejected as statistically unreliable for the purpose of rebutting the one-foot presumption.[91]  Duke’s complaint that the Bureau should not have attributed {[     ]} feet of space to Duke also lacks merit as this allocation was based on the sworn testimony of a Duke witness.[92]

25.     We reject Duke’s further contention that in order to establish that the JUA rates are unjust and unreasonable, AT&T had to prove that the “‘monetary value’ of the benefits under the JUA does not justify the difference between the ‘rate’ AT&T paid under the JUA and the Old Telecom Rate.”[93]  To support that position, Duke relies on the Bureau’s decision in *Verizon Florida*.[94]  But as we recently explained, to the extent *Verizon Florida* “can be read to require a party in a pole attachment complaint proceeding . . . to quantify the value of individual benefits an incumbent LEC receives under a joint use agreement, we reject that interpretation as impracticable, especially in the absence of any rules prescribing a methodology for valuing such benefits.”[95]  We made it clear that under either the *2011*

---

[88] *2011 Order*, 26 FCC Rcd at 5337, para. 218 & n.662.  The Bureau also considered proportionality in *AT&T v. FPL I*, where it found that the JUA rates were unjust and unreasonable based in part on facts showing that “AT&T pays virtually the same rate per pole that FPL pays” even though “the JUA reserves six feet of space to FPL and only four feet to AT&T” and “AT&T’s attachments occupy only 1.18 feet of space.”  *AT&T v. FPL I*, 35 FCC Rcd at 13612, para. 13.  Duke also objects that the rate it currently pays for attachments on AT&T poles exceeds AT&T’s entire pole cost whereas the rate AT&T pays Duke is less than Duke’s annual pole cost.  *See* Petition at 3 n.13.  But this is not the relevant comparison; rather, the question is whether the advantages the JUA provides AT&T over competitive attachers justify the amount Duke charges AT&T.  Further, Duke’s argument about the rate it currently pays AT&T overlooks that the *Order* directed the parties to “negotiate a new reciprocal joint use agreement” “that reflects proportional reciprocal rates for Duke’s attachments to AT&T’s poles,” *Order*, 36 FCC Rcd at 13715, para. 64(b), and AT&T has committed to “making appropriate adjustments to [Duke’s] rate for all years covered by the statute of limitations if AT&T’s complaint is granted.”  AT&T PFR Opposition at 9 n.38 (citing Reply at 48, para. 22).

[89] A one-foot presumption is used in both the Old Telecom Rate and the New Telecom Rate.  *See* 47 CFR § 1.1418 (2010); 47 CFR § 1.1410.

[90] Petition at 4.

[91] *Order*, 36 FCC Rcd at 13708-09, paras. 49-51.  Notably, Duke does not challenge the Bureau’s ruling regarding the unreliability of the survey it offered.  Duke’s further argument that the Bureau failed to consider that the 1977 JUA allocated {[     ]} feet to AT&T also lacks merit.  *See* Petition at 4.  First, the current JUA, unlike the prior 1977 JUA, does not specify the amount of space allocated to either party.  *See Order*, 36 FCC Rcd at 13693-94, para. 20 & n.60.  Second, and more fundamentally, long-standing Commission precedent holds that an attacher can only be assessed for space it *actually* occupies.  *See Order*, 36 FCC Rcd at 13708-09, para. 51 n.171 (citing *AT&T v. DEF*, 2021 WL 4170563, at *16, para. 49 (stating that under Commission rules, utilities may “charge attachers only for the physical space occupied by their attachments”)).  Elsewhere in this Order, we address Duke’s further argument that we should reconsider the Bureau’s decision not to “allocate any portion of the communications worker safety zone (a/k/a “safety space”) to AT&T.”  *See* Petition at 9-10 and *infra* Part III.D.

[92] *Order*, 36 FCC Rcd at 13704, para. 42 & n.139 (citing Burlison Answer Decl. at 5, para. 14).  Contrary to Duke’s suggestion, the Bureau’s allocation of {[     ]} feet to Duke was not based on the allocation in the 1977 JUA; the Bureau merely noted that this admission by Duke’s witness was consistent with the allocation in the 1977 JUA.  *See id*. at 13704, para. 42 n.139.

[93] *See* Petition at 2; *see also id*. at 2-4.

[94] *Verizon Florida LLC v. Florida Power and Light Company*, Memorandum Opinion and Order, 30 FCC Rcd 1140 (EB 2015) *(Verizon Florida)*.

[95] *Verizon Maryland Recon Order*, 2022 WL 990572, at *5, para. 14.

*Order* or the *2018 Order*, neither party is required to quantify the value of individual benefits that the incumbent LEC receives under a JUA.[96]

> **3.      The Bureau correctly held that AT&T is entitled to a rate that does not exceed the Old Telecom Rate for the period governed by the *2011 Order***

26.      The Bureau was unpersuaded by Duke's attempt to show that the JUA rates are justified by the value of the benefits AT&T receives, and correctly held that AT&T is entitled to a rate that does not exceed the Old Telecom Rate for the period governed by the *2011 Order*.[97]  Duke attacks this ruling on two basic grounds, neither of which has merit.

27.      *First*, Duke maintains that the Old Telecom Rate may not serve as a reference point for existing joint use agreements that pre-date the *2011 Order*.[98]  We disagree.  In *Verizon Maryland*, the Commission, as here, addressed an existing joint use agreement executed before the *2011 Order* that provided the incumbent LEC with material advantages over competitive attachers.[99]  The Commission noted that "the *2011 Order* indicates that the Commission would look to the Old Telecom Rate in complaint proceedings involving a new agreement between an incumbent LEC and pole owner when the incumbent LEC is not 'similarly situated' to competitive LECs or cable attachers on the same poles."[100]  It then decided to "[a]pply[] this guidance" to the case before it, and ruled that the incumbent LEC was "entitled to a rate no greater than the Old Telecom Rate for the . . . timeframe . . . covered by the *2011 Order*."[101]

28.      The Commission explained in the *2011 Order* that "identify[ing] a specific rate to be used as a reference point" in complaint proceedings would "enable better informed pole attachment negotiations" and "provide[] parties clearer expectations regarding the potential outcomes of formal complaints."[102]  The Commission found "it more administrable to look to [the Old Telecom Rate], which historically has been used in the marketplace, than to attempt to develop in this Order an entirely new rate for this context."[103]  The Commission noted that the Old Telecom Rate, which is "a higher rate than the regulated rate available to telecommunications carriers and cable operators, [] helps account for particular arrangements that provide net advantages to incumbent LECs relative to telecommunications carriers and cable operators."[104]  More recently, the Commission affirmed that "the Old Telecom Rate best accomplishe[s] the goals of compensating utilities for advantages provided to incumbent LECs under

---

[96] *Verizon Maryland Recon Order*, 2022 WL 990572, at **5-6, paras. 13-16; *accord Bellsouth Telecomms., LLC v. Florida Power & Light*, Proceeding No. 19-187, Order on Review, 2022 WL 2104259, at *3, para. 9 (2022) (*AT&T v. FPL Order on Review*) (noting that the *2011 Order* does not require a utility to justify a rate higher than the New Telecom Rate with quantified costs it incurs).

[97] *Order*, 36 FCC Rcd at 13705-07, paras. 43-47.  In ruling that AT&T is entitled to a rate no higher than the Old Telecom Rate, the Bureau observed that neither party had provided a credible valuation of the advantages that AT&T receives under the JUA.  *Id*. at 13707, para. 47.

[98] Petition at 1, 2, 4-6.

[99] *Verizon Maryland*, 35 FCC Rcd at 13619, para. 30.

[100] *Id.*, 35 FCC Rcd at 13619, para. 30.

[101] *Id.*, 35 FCC Rcd at 13619, para. 30.  *See also AT&T v. FPL I*, 35 FCC Rcd at 5331, para. 17 (reviewing an existing joint use agreement under the *2011 Order* and concluding that the Old Telecom Rate "provides a reference point for a 'just and reasonable rate'").

[102] *2011 Order*, 26 FCC Rcd at 5337, para. 218.

[103] *2011 Order*, 26 FCC Rcd at 5337, para. 218.  *Cf. id.* at 5299, 5304, 5316, paras. 136, 149, 172 (stressing that the New Telecom Rate should be "readily administrable" and consistent with Congress's direction that pole attachment rate regulations be "simple and expeditious" to implement).

[104] *2011 Order*, 26 FCC Rcd at 5337, para. 218.

JUAs, while keeping the rates just and reasonable based on costs, as reflected in the Commission's rate formula."[105]

29.     *Second*, Duke complains that the Bureau improperly rejected its efforts to prove that the JUA rate is justified by the value of the net benefits AT&T receives, and that Duke is therefore entitled to a rate that exceeds the Old Telecom Rate for periods governed by the *2011 Order*. We disagree. Duke's valuation, which largely rests on hypothetical scenarios that assume the JUA never existed, conflicts with the Commission's decision to use the established Old Telecom Rate as a reference point rather than developing "an entirely new rate."[106] As discussed below, the Bureau correctly rejected Duke's efforts to value the benefits that the JUA provides to AT&T.

30.     *Guaranteed Access and Right to Remain on Poles After Termination.* Duke contends that the Bureau wrongly rejected its attempt to value AT&T's guaranteed right of access to Duke poles under the JUA and its right to keep existing attachments on the poles after the JUA terminated.[107] Duke's valuation of the access right assumed that, absent the JUA, Duke's poles would not have been strong enough or tall enough to accommodate AT&T's attachments and that AT&T, as the first attacher on most Duke poles, "'likely would have been required to either (a) pay make-ready costs to replace nearly every [Duke] pole to which it is attached, or (b) construct an entirely redundant network of poles.'"[108] Duke's valuation of AT&T's right to keep attachments on the poles post-termination assumed that, absent that right, AT&T would incur the costs of constructing a duplicate pole network.[109]

31.     In rejecting Duke's valuation of the access right, and the right to remain on the poles, the Bureau noted that the Commission has never condoned valuing an alleged advantage by assuming that without the JUA, an incumbent LEC would build a duplicate pole network.[110] As the Bureau correctly observed, "replicating Duke's 148,000 pole network [is] unrealistic from AT&T's perspective given the difficulty of obtaining the necessary zoning and other approvals."[111] Duke's speculation that AT&T would build a duplicative pole network in a hypothetical world where the JUA did not exist overlooks the very real possibility that regulatory measures at the local, state, and federal levels would prevent just the

---

[105] *Verizon Maryland Recon Order*, 2022 WL 990572, at *5, para. 15 (quoted with approval in *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *3, para. 9 & n.33).

[106] *2011 Order*, 26 FCC Rcd at 5337, para. 218.

[107] Petition at 13-17. As noted above, the JUA permitted either party to terminate the right to make additional attachments to its poles upon one year's notice. JUA, Art. XVII.A, B at 12.

[108] *Order*, 36 FCC Rcd at 13705, para. 43 & n.144 (quoting Freeburn Answer Decl. at 6, para. 12). Based on these hypothetical scenarios, Duke estimated the net annualized value of avoided make-ready costs to AT&T—i.e., the cost to replace 100 percent of Duke poles to which AT&T is attached at current day prices—as {[          ]} per pole. *Id*. at 13705, para. 43 & n.145.

[109] Petition at 13-15. *See Order*, 36 FCC Rcd at 13705-06, para. 44 & n.152

[110] *Order*, 36 FCC Rcd at 13705, para. 44 & n.147 (citing observation in *AT&T v. FPL I*, 35 FCC Rcd at 5330, para. 15 & n.67 that "as Congress has found, owing to a variety of factors, including environmental and zoning restrictions, there is 'often no practical alternative . . . except to utilize available space on existing poles.'") (quoting S. Rep. No. 580, 95th Congress, 1st Sess. at 13 (*1977 Senate Report*), *reprinted in* 1978 U.S.C.C.A.N. 109); *id*. at 13706, para. 45 & n.152). Duke argues that the portion of the *1977 Senate Report* quoted in *AT&T v. FPL I* addressed cable operators, "not telephone companies . . . like AT&T" that "have always had" the ability to build pole networks. Petition at 14. But the cited passage from that *Senate Report* recognizes that duplication of pole networks poses obstacles for all parties, observing: "[s]haring arrangements minimize unnecessary and costly duplication of plant for *all* pole users, *utilities as well as cable companies*." *1977 Senate Report* at 13 (emphases added). *See* 47 U.S.C. § 224(a)(1)(defining "utility" to include "a local exchange carrier").

[111] *Order*, 36 FCC Rcd at 13702-03, para. 39 n.131.

sort of wasteful, duplicative construction that Duke envisions.[112]  The Bureau was therefore right to reject Duke's effort to justify an inflated rate based on the cost of a duplicative network that does not, and likely never would, exist.[113]

32.     Duke's attempt to value the access right by claiming it built a network of 40-foot poles that were taller than necessary for its own use to accommodate AT&T fails for several other reasons. First, as AT&T notes, the height of Duke's poles is not a competitive advantage for AT&T, as AT&T's competitors also require space on Duke's joint use poles and have for decades.[114]  As the Bureau observed, "'[b]y 1978, cable attachments were so common that Congress saw fit to regulate their rates and, by 1996, amended section 224 of the Act to provide cable and competitive LECs a statutory right of access.'"[115]

33.     Second, Duke did not offer persuasive evidence that it would have used shorter poles in the absence of the JUA.[116]  Nor did Duke offer any proof as to how the language in the JUA defining a "Standard Joint Use Pole" as a 40-foot pole came to be included in the agreement.[117]  While Duke relies on the declaration testimony of two Duke employees asserting that Duke's pole network would have been built with shorter poles in the absence of the JUA,[118] the Bureau found their conclusory statements unpersuasive.[119]  We agree.  The Duke declarants, who joined the company long after the 1977 JUA was executed, did not establish that they had any role in determining the height of Duke poles at the time the parties entered either the 1977 JUA or the current JUA in 2000.[120]  Further, the declarants do not indicate

---

[112] *See Verizon Maryland*, 35 FCC Rcd at 13626, para. 42 (utility poles "are subject to laws and regulations at the state and local level, even where a state has not exercised its 'reverse preemption' option under section 224(c) of the Act") (internal citations omitted); *see also* Dippon Reply Aff. at 24, para. 47 ("It is impossible to conclude that a regulator a half-century ago would have considered it prudent for two rate-of-return regulated utilities sharing common ratepayers to build and then rebuild the pole line both companies required.").

[113] Duke's failure to adequately document the basis for its {[          ]} per pole annualized system replacement cost, *see* Dippon Reply Aff. at 23, paras. 44-45 (detailing documentation failures), and Duke's use of a pricing methodology that assumes replacement of a single standalone pole, which fails to account for the likely discounted cost of purchasing 148,000 poles at one time, *see id.* at 23, para. 45; AT&T Reply Brief at 10, provide additional reasons to reject Duke's valuation.

[114] *See* AT&T PFR Opposition at 16.  The *2011 Order* directs parties to compare the terms in an incumbent LEC's pole attachment agreement with those in a utility's agreements with competitive attachers to determine whether the incumbent LEC's agreement provides it with material advantages.  *See 2011 Order* at 5336-37, paras. 217-218.  The Bureau thus correctly rejected Duke's attempt to justify a higher rate based on AT&T's historical status as the first attacher on Duke's poles, rather than on specific, advantageous terms in the JUA.  *Order*, 36 FCC Rcd at 13705, para. 44 & n.146.  *See Verizon Maryland*, 35 FCC Rcd at 13620, para. 32 (rejecting alleged benefits that "relate to the date the JUA was entered into and not to any specific terms and conditions in the JUA").

[115] *Order*, 36 FCC Rcd at 13706, para. 45 & n.151 (quoting *Verizon Maryland*, 35 FCC Rcd at 13620, para. 32 & n.100) (citing *2011 Order*, 26 FCC Rcd at 5245, paras. 9-10; *2018 Order*, 33 FCC Rcd at 7707, para. 5).  *See 1977 Senate Report* at 13 (noting that cable operators were already attached to more than 10 million utility poles).

[116] *Order*, 36 FCC Rcd at 13705-06, para. 45 & n.150.

[117] JUA, Art. I.K.

[118] *See* Petition at 16 ("'If [Duke] had constructed its network in the absence of the Joint Use Agreement, [Duke] would have built a network only to its own service needs; thus, the pole network would have been built with shorter poles'") (quoting Freeburn Answer Decl. at 5-6, paras. 11-12); *see also* Petition at 16 n.67 (quoting Hatcher Answer Decl. at 4, para. 9 ("'[Duke] has always needed to set a pole 5-10 feet taller than necessary for electric service in order to accommodate AT&T's facilities and the safety space.'"); *id.* at 16 n.67 (citing Burlison Answer Decl. at 5-7, paras. 11-15).

[119] *See* Petition at 15-17; *see also Order*, 36 FCC Rcd at 13705-06, para. 45 & n.150.

[120] Duke's valuation of the right of access is unpersuasive for the additional reason that Duke calculated the avoided make-ready cost to replace all Duke poles with AT&T attachments based on present-day costs, instead of costs at

(continued….)

that they examined any company records documenting Duke's decision-making concerning the height of its poles at the time the parties entered the 1977 JUA or the JUA in 2000.[121] Additionally, as the Bureau pointed out, Duke provided no information regarding the height of the poles in the parties' overlapping service area before and immediately after the parties entered into a joint use relationship in 1977; nor did Duke present data on the height of Duke poles not jointly used by AT&T.[122]

34.    Finally, Duke's assumption that AT&T would have had to replace all of Duke's poles in the absence of the JUA is undermined by the evidentiary record in this instance. An AT&T operations manual that Duke submitted with its Answer[123] shows that by 1972 (i.e., five years before the 1977 JUA), it was electric utilities—not telephone companies—that more commonly required taller poles.[124] Duke's assumption is also undermined by language in the JUA expressly recognizing that in some circumstances, the parties may use a joint use pole that is shorter than 40 feet, thus raising doubts about Duke's assertion

---

(Continued from previous page)

the time the JUA was executed, yielding an inflated figure of {[    ]} per pole per year. *See Order*, 36 FCC Rcd at 13705-06 n.147. Use of present-day costs is inappropriate because Duke's calculation is based on the theory that because AT&T was almost always the first communications attachment on Duke's poles, "but for the JUA's requirement of taller joint use poles, AT&T would have been required to change out virtually every [Duke] pole to which it desired to make attachments." Duke Brief at 5-6. Duke thus posits a hypothetical pole replacement scenario that would have occurred when AT&T became the first attacher on Duke's poles.

[121] As the Bureau correctly noted, Duke's valuation of the access right is also flawed because Duke assumes the absence of both the 1977 JUA and the JUA (executed in October 2000), and posits that AT&T would have had to replace every pole on which it currently has attachments. *See Order*, 36 FCC Rcd at 13705, paras. 43-44 & n.144. Duke's calculations would have yielded a substantially lower value if Duke had assumed only the absence of the JUA, given that AT&T was already attached to tens of thousands of Duke poles when the parties executed the JUA in 2000. *See* Peters Reply Aff. at 6, para. 9 (estimating that AT&T was attached to more than 125,000 Duke poles when the parties entered the JUA in 2000); Miller Complaint Aff. at 3, para. 7; Reply Legal Analysis at 14 (by the time the JUA was entered, AT&T had facilities attached to over 84% of the joint use poles currently owned by Duke).

[122] *Order*, 36 FCC Rcd at 13706 n.150. *See* Dippon Reply Aff. at 24-27, paras. 48-49 (citing data from another dispute to illustrate that electric utilities regularly install poles taller than 35 feet without any communications facilities attached). Duke attempts to bolster its valuation of AT&T's access right by quoting, out of context, a passage from the *2011 Order* stating: "it would typically not be economically rational for utilities to build taller poles solely for the possibility of accommodating attachers and therefore incur unreimbursed capital costs . . . ." *See* Petition at 16 & n.70 (citing *2011 Order*, 26 FCC Rcd at 5302, para. 144 n.433). The quote comes from a portion of the *2011 Order* explaining why the Commission decided to exclude capital costs from the New Telecom Rate based on cost-causation principles. The Commission stated that apart from capital costs arising from the make-ready process "the record demonstrates that the attacher is not the 'cost causer' of these costs." *2011 Order*, 26 FCC Rcd at 5301-02, para. 144. Duke overlooks that the *Old* Telecom Rate—the relevant reference point here—takes account of the utility's capital costs. *See 2011 Order*, 26 FCC Rcd at 5301-02, para. 144 ("[U]nder traditional ratemaking principles that we have applied in the past, the telecom rate for pole attachments recovered both operating expenses and capital costs, including a rate of return, taxes, and depreciation."); *id.*, 26 FCC Rcd at 5300, para. 141 (the Old Telecom Rate formula "is based on a fully allocated cost methodology, which recovers costs that the pole owner incurs regardless of the presence of attachments.). Further, although Duke apparently agrees that competitive attachers are not responsible for the capital costs associated with Duke's decision to build poles of a certain height, Duke does not account for the fact that, prior to the adoption of the New Telecom Rate in the *2011 Order*, Duke was permitted to charge competitive attachers the Old Telecom Rate, which included such capital costs.

[123] *See* Answer, Exh. 6 (cited in *Order*, 36 FCC Rcd at 13706 n.151).

[124] *See* Answer, Exh. 6 at 1 (noting that electric utility pole lines in many cases provide sufficient "strength and clearances" to allow telephone company attachments "with little or no rearrangements or pole replacements" while, by contrast, "it is usually necessary to rebuild" a typical telephone line in order to accommodate electric power facilities). We reject Duke's assertion that the Bureau misread Exhibit 6 to the Answer. *See Order*, 36 FCC Rcd at 13706 n.151 (citing Answer, Exh. 6 ). There is no basis to conclude, as Duke suggests, that the document relates only to "the replacement of poles already in joint use." *See* Petition at 17.

that it was required to install 40-foot poles throughout the joint use network specifically for AT&T's benefit.[125]

35.      *Scheduled Costs for Pole Replacements.*  The Bureau found that the JUA provision requiring AT&T to pay scheduled costs (also called "tabulated costs"), rather than actual costs, to replace a Duke pole provided AT&T with a budgeting and planning advantage over competitive attachers.[126] Duke takes issue with the Bureau's decision to make no finding regarding the dollar amount of that advantage due to a lack of information in the record about whether equipment transfer costs were included in Duke's estimate of the average cost savings that advantage provides.[127]  The Bureau was correct.  First, the {[        ]} figure, which purportedly represents the average cost of a pole replacement for Duke in 2019, is not documented and rests on the uncorroborated testimony of a single witness.[128] Second, as AT&T points out, Duke's calculated advantage of {[          ]} is derived by comparing the lowest value in the JUA's pole replacement cost schedule to Duke's purported average cost to replace poles of *all* heights and sizes.[129]  Third, Duke has not identified what part of the {[        ]} figure consists of the cost of the replacement pole itself, and what part consists of the cost to transfer Duke's or other attachers' equipment or to perform other work related to a pole replacement.[130]

36.      Finally, the record contains no information about the extent to which AT&T makes use of the scheduled cost benefit.  Duke argues that the scheduled cost provision provided "'a cost savings to AT&T of approximately {[          ]}'" between 2009 and 2017.[131]  But the {[          ]} figure is

---

[125] *See Order*, 36 FCC Rcd at 13706, para. 45 & n.151 (cited in Petition at 17 & n.74).  We are not persuaded by Duke's assertion that "whether or not a 35-foot pole or a hypothetical 37.5-foot pole might accommodate AT&T has no bearing on whether '[Duke], because of the Joint Use Agreement, was on average installing poles that were 5-10 feet taller than necessary to provide electric service."  Petition at 17.  Duke's valuation of AT&T's access right under the JUA is based on the assumption that absent the JUA, Duke's poles would have been shorter and AT&T, as the first attacher on most Duke poles, would have had to "either (a) pay make-ready costs to replace nearly every [Duke] pole to which it is attached, or (b) construct an entirely redundant network of poles."  *Order*, 36 FCC Rcd at 13705, para. 43 (quoting Freeburn Answer Decl. at 6, para. 12).  Evidence that a pole of 35 or 37.5 feet would have accommodated AT&T's attachments undermines Duke's argument that, absent the JUA, AT&T would have had to replace nearly every Duke pole or build a redundant network.

[126] *See Order*, 36 FCC Rcd at 13695-96, paras. 24-27.  The Bureau noted that while the current scheduled cost in the JUA for a replacement pole that is 50 feet or less in height is {[        ]}, Duke stated that "when it replaces a pole for its competitive LEC or cable licensee," the licensee pays "'actual, work order costs,' which average {[        ]} per pole replacement."  Thus, Duke claimed that "the difference represents an average cost advantage to AT&T of {[        ]}."  *Id*. at 13695, para. 24 & nn.73-75.

[127] *See* Petition at 11-13; *Order*, 36 FCC Rcd at 13696, para 26 ("Because the record does not indicate the extent to which equipment transfer costs are included in Duke's average cost estimate or in the Exhibit B scheduled cost for a pole replacement, we make no finding with respect to Duke's claim that the average cost advantage to AT&T is {[        ]}."); *see also id*., 36 FCC Rcd at 13707, para. 46.

[128] *See* Freeburn Answer Decl. at 11-13, 32, paras. 23-25, 32; *see also* Metcalfe Answer Decl. at 13-14, paras. 28-30 (addressing Duke's average pole replacement cost and, by extension, the cost to competitive attachers to Duke poles, based on declarant's "discussions with Mr. Freeburn").

[129] *See*, *e.g.*, Freeburn Answer Decl. at 12, para. 24 (comparing "the average cost of a pole replacement" when Duke replaces poles of unspecified height for "CATV or CLEC licensees" with the lowest value in the JUA's pole replacement cost schedule); *accord* Peters Reply Aff. at 21, para. 33 (citing Freeburn Answer Decl. at 12, 16, paras. 24-25, 35) (describing "apples to oranges" comparison).

[130] Thus, the record is unclear as to the specific costs included in Duke's average cost estimate for a pole replacement.  *See, e.g.,* Metcalfe Answer Decl. at 13-14, para. 30 & n.48 (describing AT&T's equipment transfer costs after a pole replacement as a "significant component of the total cost"); *id*. at 13, para. 29 & nn.42-43 (noting that AT&T also "may be required to pay a third party to rearrange CLEC or CATV attachments").

[131] Petition at 12-13 (citing Freeburn Answer Decl. at 12-13, para. 25).  The period 2009 to 2017 has no particular relevance to this dispute and extends well beyond the governing limitations period.

for Duke's alleged replacement of {[        ]} "*AT&T-owned poles on AT&T's behalf*" from 2009 to 2017.[132]  Duke has provided no data on the number of *Duke* poles it replaced for AT&T during any period, which is the relevant measure in valuing the benefit AT&T enjoys over competitive attachers who need to replace *Duke* poles.[133]  For all of these reasons, we agree that the record contains insufficient evidence to determine the value of the scheduled cost benefit.

37.    *Inspection and Engineering Costs*.  We reject Duke's further claim that the Bureau erred by failing to credit Duke's valuation of the benefits AT&T receives under the JUA through avoided fees for inspection and engineering work that Duke performs on AT&T's behalf.[134]  The Bureau correctly found that Duke failed to identify or document the specific inspection or engineering work it purportedly performs on AT&T's behalf.[135]  Duke claims that one of its witnesses "provided both an explanation of the engineering and inspection work avoided by AT&T, and a valuation of the benefit of those avoided costs to AT&T."[136]  In fact, Duke's witness merely provided a one-page list of permitting, engineering, and inspection costs that Duke licensees allegedly pay,[137] without providing any documentation regarding the specific engineering or inspection work Duke claims to have performed for AT&T.  AT&T has shown that it performs its own engineering and inspection work for its attachments to Duke poles—a point Duke does not dispute.[138]  While Duke is free to double-check the engineering and inspection work that AT&T performs for AT&T's attachments to Duke poles, we fail to see how AT&T benefits from Duke's work, when Duke has provided no evidence that it even communicates the results of its inspection or engineering work to AT&T.[139]

**C.    The Bureau Applied the Correct Statute of Limitations**

38.    Duke seeks reconsideration of the Bureau's ruling that a three-year limitations period governs any refund awarded in this case under Commission rule 1.1407.[140]  Neither the Act nor Commission rules specify a limitations period for pole attachment complaints.  The Bureau therefore

---

[132] Freeburn Answer Decl. at 12, para. 25 (emphasis added) (explaining that Duke's practice of replacing AT&T-owned poles on AT&T's behalf is called "set and sell").

[133] In the PFR Reply and the AFR Opposition, Duke asserted for the first time that "[i]f AT&T were to request {[    ]} replacements of [Duke] poles in a given year" Duke "would be required to absorb an additional {[            ]} in pole replacement costs" based on its estimate that each replacement costs {[        ]} on average.  *See* PFR Reply at 10; AFR Opposition at 24.  Because Duke makes no effort to substantiate its belated 500 pole replacement figure, we accord it no weight.  This lack of substantiation is particularly suspect, given that Duke's own witness suggests that replacement of Duke poles on AT&T's behalf is "relatively rare."  *See* Metcalfe Answer Decl. at 13, para. 29 (describing as a "relatively rare and unusual circumstance[]" AT&T's need for a pole replacement where AT&T "requires additional height").  *See also* Dalton Reply Aff. at 5, para. 9 (describing replacement of a Duke pole to create additional capacity for AT&T as "an exceptionally rare scenario because there is usually space on [Duke's] poles for an additional communications attachment").

[134] Petition at 18-19 (citing *Order*, 36 FCC Rcd at 13699, para. 34).

[135] *Order*, 36 FCC Rcd at 13699, para. 34.

[136] Petition at 18 & n.78 (citing Freeburn Answer Decl. at 10, paras. 20-21 and Freeburn Decl. Exh. A-2); *see also id*. at 18-19 (citing Metcalfe Answer Decl. paras. 25-27, Exh. E-4.2).

[137] *See* Freeburn Answer Decl. at 10-11, para. 21 (citing Freeburn Decl. Exh. A-2).

[138] *See Order*, 36 FCC Rcd at 13699, para. 34 & n.105 (citing Peters Reply Aff. at 19, para. 30); *see also* Peters Reply Aff. at 17-19, paras. 29-30; Dalton Reply Aff. at 3-4, paras. 6-7; Oakley Reply Aff at 3-4, paras. 5-6.

[139] *Order*, 36 FCC Rcd at 13699, para 34 & n.106.  *See also* Peters Reply Aff. at 17-19, paras. 29-30 & nn.58, 60 (asserting that the JUA does not require Duke to double-check AT&T's inspection work, and the first time AT&T heard that Duke "double-checks" AT&T's inspection work was in reading the declaration of Duke's witness, Mr. Freeburn).

[140] 47 CFR § 1.1407(a); Petition at 24.

followed the "borrowing" rule established in prior Commission cases, which looks to the law of the state where the utility's poles are located, determines the state cause of action most analogous to the claims at issue, and applies the state statute of limitations for such actions.[141]  The Bureau found that a state limitations period governing breach of contract actions was most closely analogous to the claims at issue, determined that the limitations period for contract actions in both North Carolina and South Carolina is three years, and concluded that this case is therefore governed by a three-year statute of limitations.[142]

39.     In its Petition, Duke argues that the Commission should instead borrow the two-year limitations period in section 415(b) of the Act, which governs complaints against a "carrier" for the recovery of damages not based on overcharges.[143]  Because Duke never made that argument in its Answer as our rules require,[144] we deny Duke's request for reconsideration on procedural grounds as Duke has failed to make any showing that either of the circumstances under which the Commission may grant reconsideration based on an argument not previously presented to the Commission exist.[145]  We find that consideration of Duke's untimely argument is not required in the public interest.[146]

40.     As an alternative basis for our holding, we find that Duke's argument for application of section 415(b) fails on the merits.  Duke has not shown that application of section 415(b) is warranted under a narrow exception to the borrowing rule that allows application of a federal, rather than a state, statute of limitations "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking."[147]  Duke has not demonstrated that section 415(b) provides a "closer analogy" to this dispute, or that it is "significantly more appropriate" than the state statute.  In *Verizon Maryland*, the Commission found unpersuasive the utility's argument that the two-year limitations period in section 415(b) should apply to a pole attachment complaint against a utility, noting that a utility is not a "carrier," and "is not subject to the various rights and obligations of carriers specified in the Act and the Commission's rules."[148]  Ignoring that precedent, Duke makes a general argument in favor of adopting a uniform limitations period applicable to all pole attachment complaints under the Commission's jurisdiction, rather than relying on state limitations periods that may vary from state to state.[149]  But application of limitations periods that vary by state is

---

[141] *See Order*, 36 FCC Rcd at 13711-12, paras. 58-60 & nn.195, 196, 198 (citing *Verizon Maryland*, 35 FCC Rcd at 13626-27, paras. 41-43 & n.155); *see also AT&T v. FPL II*, 36 FCC Rcd at 256, paras. 9-10 & nn.24, 26; *AT&T v. DEF*, 2021 WL 4170563, at \*19, para. 57.

[142] *Order*, 36 FCC Rcd at 13712, para. 59 & nn.199, 200 (citing N.C. Gen. Stat. § 1-52(1); S.C. Code Ann. § 15-3-530(1)).

[143] Petition at 24-25; 47 U.S.C. § 415(b) (providing that "[a]ll complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after").

[144] *See* Answer at 56-58 (arguing that the Commission instead should borrow the limitations period in section 415(c) of the Act governing complaints against a carrier for the recovery of overcharges assessed under a tariff); 47 CFR § 1.726(b), (c).

[145] *See* 47 CFR § 1.106(c); Petition at 24-25; *see also, e.g., Verizon Maryland Recon Order*, 2022 WL 990572, at \*8, para. 25 (denying reconsideration where Potomac Edison failed to show that the circumstances in section 1.106(c) permitting reconsideration based on an argument not previously presented to the Commission exist).

[146] *See* 47 CFR § 1.106(c)(2).

[147] *Verizon Maryland*, 35 FCC Rcd at 13626, para. 41 & n.150 (citing *North Star Steel Co. v. Thomas*, 515 U.S. 29, 35 (quoting *Reed v. United Transp. Union*, 488 U.S. 319, 324 (1989), which in turn was quoting *DelCostello v. Teamsters*, 462 U.S. 151, 172 (1983) (internal quotation marks omitted)).

[148] *Verizon Maryland*, 35 FCC Rcd at 13627, paras. 44-45.

[149] Petition at 24-25.  In its Petition, Duke cites a petition for declaratory ruling and related filings submitted in a separate Commission proceeding.  *See* Petition at 22-24 & nn.95, 101 (citing Petition for Declaratory Ruling of the

(continued….)

inherent in the Commission's decision in *Verizon Maryland* to adopt a borrowing rule "favoring the application of a state limitations period" in pole attachment complaint proceedings.[150]

41.    Duke also argues that the Bureau failed to examine whether it is "appropriate" to order a refund under rule 1.1407(a)(3) for periods prior to good faith notice of a dispute, either generally or with specific reference to the facts of this case.[151]  Duke asserts that AT&T first challenged the amount Duke was charging under the JUA on May 22, 2019, and that prior to that date, AT&T expressly affirmed the correctness of the rates each year through 2018.[152]  Under these circumstances, Duke argues it was not "appropriate" for the Bureau to grant refunds for periods prior to May 22, 2019.[153]  Because Duke relies on an interpretation of rule 1.1407(a)(3) that it did not advance in the complaint proceeding and has not shown that either of the circumstances under which the Commission may grant reconsideration based on an argument not previously presented to the Commission exist, we deny this request for reconsideration.[154]  In any event, we reject Duke's interpretation of rule 1.1407(a)(3) on the merits because it conflicts with the Commission's decision not to modify its rules to "preclude monetary recovery for any period prior to the time a utility receives actual notice of a disputed charge."[155]  The Commission found that such a modification "runs counter to the very idea of a statute of limitations, which permits complaints to be filed up until the last day of the limitations period."[156]

### D.    The Bureau Correctly Held That In Calculating the Rate, Duke May Not Charge AT&T for the Safety Space

42.    Duke seeks reconsideration of the Bureau's holding that Duke may not charge AT&T for

(Continued from previous page) ———————————————

Electric Edison Institute, *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84 (filed Apr. 20, 2021)) (EEI Petition); *see also* Petition at 24 nn.99, 101, 103; *Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, Second Further Notice of Proposed Rulemaking, WC Docket No. 17-84 (rel. Mar. 18, 2022).  We address here only the arguments Duke makes in the Petition in this case.

[150] *Verizon Maryland*, 35 FCC Rcd at 13626, para. 42.  Duke faults the Bureau for failing to consider how it would "borrow" state law limitations periods in a case where the poles at issue span multiple states with different limitations periods.  *See* Petition at 24-25.  There was no need for the Bureau to examine that hypothetical scenario, however, because the applicable limitations period in both North and South Carolina is three years.  *See Order*, 36 FCC Rcd at 13712, para. 59 & n.197.  We also reject Duke's assertion that applying state law limitations periods to pole attachment complaints against electric utilities is discriminatory because an action against an incumbent LEC under section 224 would be governed by the two-year limitations period in section 415(b).  *See* Petition at 24.  The Commission has not addressed what limitations period would apply to an action against an incumbent LEC under section 224, and there is no need to address that issue here.  *See AT&T v. DEF*, 2021 WL 4170563, at *20, para. 61 n.222 (finding no need to address Duke's argument that AT&T may in the future assert that an action against AT&T by a communications attacher under section 224 is governed by the two-year limitations period in section 415(c)).

[151] Petition at 22-23.  Duke suggests that language in rule 1.1407(a)(3) stating that the Commission "may prescribe a just and reasonable rate, term, or condition and may . . . [o]rder a refund, or payment, if appropriate" requires the Commission to examine whether a refund is "appropriate" where it finds that an attacher has paid unreasonable rates.  *See* 47 CFR § 1.1407(a)(3).  Duke cites no Commission authorities supporting its interpretation of rule 1.1407(a)(3).

[152] Petition at 22-23.

[153] *Id.* at 23.

[154] *See* 47 CFR § 1.106(c); Petition at 22-23.  We find that consideration of Duke's untimely argument is not required in the public interest.  *See* 47 CFR § 1.106(c)(2).

[155] *2011 Order*, 26 FCC Rcd at 5290, para. 112.

[156] *Id.*; *see also AT&T v. FPL II*, 36 FCC Rcd at 258, para. 14 n.42 ("the Commission has already considered and rejected the suggestion that an attacher should receive no refund for the period before it disputes its rate") (citing *2011 Order*, 26 FCC Rcd at 5290, para. 112).

the 40 inches of safety space on Duke's poles.[157]  Duke argues that AT&T should bear the cost of the safety space because Duke does not use that space, and it would not have built the safety space on its poles but for its joint use arrangement with AT&T.[158]  We affirm the Bureau's holding, which was based on settled precedent.[159]  In 2000, the Commission explained that the cost of the space is attributed to the utility because "[i]t is the presence of the potentially hazardous electric lines that makes the safety space necessary and but for the presence of those lines, the space could be used by . . . attachers."[160]  Because the safety space "would otherwise be usable space" but for the presence of the electric lines, the Commission held that "the safety space is effectively usable space occupied by" the electric lines.[161]  The

---

[157] Petition at iii, 9-10.

[158] *Id.* at 9 (arguing that the Bureau "ignored the Commission's foundational 'cost causation' principles").  Duke's Petition relies on arguments that the Bureau considered and properly rejected.  *See* Answer at 13-14, 37-42.  In the alternative, Duke argues that if the 40 inches of safety space is not allocated entirely to AT&T (1) a pro rata share of the safety space should be allocated to AT&T and other attachers as additional usable space occupied; or (2) the 40-inch safety space should be treated as unusable space for purposes of calculating the Old Telecom Rate.  Petition at 10 & nn.49-50.  We do not address these alternative proposals here because their adoption would require changes to our rules, which state that "the space occupied by an attachment is presumed to be one foot" and the "amount of usable space is presumed to be 13.5 feet," and thus would need to be addressed in a rulemaking proceeding.  47 CFR § 1.1410.  In any event, attributing a share of the safety space to AT&T under alternative (1) lacks merit because "under the Commission's rate formula, 'space occupied' means space that is 'actually occupied,' and AT&T's attachments do not actually occupy the communications safety space." *AT&T v. FPL I*, 35 FCC Rcd at 5330, para. 16.  Alternative (2) also lacks merit because, as explained below, the safety space is deemed usable space under settled Commission precedent.

[159] *Order*, 36 FCC Rcd at 13708, para. 51 n.171 (citing *AT&T v. DEF*, 2021 WL 4170563, at *16, para. 49); *see also AT&T v. FPL I*, 35 FCC Rcd at 5330, para. 16 (stating "the Commission has long held that the communication safety space is for the benefit of the electric utility, not communications attachers"); *Amendment of Rules and Policies Governing Pole Attachments*, CS Docket No. 97-98, Report and Order, 15 FCC Rcd 6453, 6467-68, paras. 21-22 (2000) (*2000 Fee Order*); *Amendment of Rules and Policies Governing Pole Attachments*, CS Docket No. 97-98, Consolidated Partial Order on Reconsideration, 16 FCC Rcd 12103, 12130, para. 51 (2001) (*2001 Order on Reconsideration*) (the safety space is "usable and used by the electric utility") (citing *Adoption of Rules for the Regulation of Cable TV Attachments*, CC Docket No. 78-144, Memorandum Opinion and Second Report and Order, 72 FCC 2d 59, 69-71, paras. 22-25 (1979) (*Second Report and Order*).

[160] *2000 Fee Order*, 15 FCC Rcd at 6467, para. 22 (holding that the safety space is therefore "usable and is used by the electric utilities"); *see id.* at para. 20 ("A 40-inch safety space was created to minimize the likelihood of physical contact between employees working on cable television or telephone lines and the potentially lethal voltage carried by the electric lines, as well as to prevent electrical contact between such cables."); *2001 Order on Reconsideration*, 16 FCC Rcd 12103, 12130, para. 51 (declining to reconsider ruling that the 40-inch safety space "is usable and used by the electric utility."); *see also 2011 Order* at 5320, para. 180 & nn.558-59 (declining to revisit prior rulings that the safety space is usable and used by the electric utility); *Second Report and Order*, 72 FCC 2d 59, 70-71, para. 24 (describing the "practical benefit to the electric utility" of the safety space).  Duke's assertion that the safety space "serves no purpose in the provision of electric service," has no bearing on the Commission's determination that safety space should be allocated to the electric utility because that space could be used by communications attachers but for the presence of the electric lines.  *See* Petition at 9; *2000 Fee Order*, 15 FCC Rcd at 6467, para. 22.

[161] *2000 Fee Order*, 15 FCC Rcd at 6468, para. 22.  The Commission thus rejected the argument that the 40-inch safety space should be considered unusable space, as Duke proposes in the alternative here.  *Id.* at 6467-68, paras. 20-22; Petition at 10.  In so ruling, the Commission likened the 40-inch safety space to the clearance space associated with a communications attachment.  The Commission noted: "A communications attachment, even though it may be a fiber optic cable with a diameter of only one inch, is presumed to occupy one foot of the attachable space because of separation requirements.  In a like manner, the electric supply cable on the pole, because of its unique spacing requirements must be 40 inches away from communications attachments." *2000 Fee Order*, 15 FCC Rcd at 6468, para. 22.  Although Duke recognizes that the one-foot presumption for "space occupied" is based on the need to allow clearance between communications attachments, Duke fails to acknowledge that the 40-inch safety space is a clearance requirement associated with the electric facilities on a pole.  *See* Duke PFR Reply at 7.

Commission affirmed this holding on reconsideration in 2001.[162]  The Commission re-affirmed this treatment of the safety space in the *2011 Order*,[163] where it further held that incumbent LECs, in certain circumstances, were entitled to the same rate as competitive attachers.[164]

43.      Duke attempts to re-litigate these rulings by suggesting that "whether space is 'usable and used' by [Duke] . . . is an inherently factual inquiry" to be conducted in each dispute.[165]  We disagree.  The Commission's conclusion that the safety space is usable and used by the electric utility was based on its determination that the existence of "electric supply cable precludes other attachments from occupying the safety space."[166]  The Commission did not base this determination on individualized facts showing whether or how particular electric utilities use the 40 inches separating their electric cables from communications attachments.[167]  Nor did the Commission mandate a factual inquiry into what caused a utility to build its poles to a height that accommodates a 40-inch safety space, as Duke would have us do here.[168]

44.      We also reject Duke's attempt to avoid Commission precedent by arguing that the Commission's "current rate formulas" do not account for the safety space in the context of cost-sharing arrangements within joint use agreements.[169]  First, whether an attacher accesses an electric utility pole under a joint use agreement or other arrangement does not alter the Commission's rationale—i.e., the presence of hazardous electric lines—for attributing the safety space to the electric utility.  Further, when the Commission adopted the New Telcom Rate formula in the *2011 Order*, it accounted for the safety space by affirming its prior ruling that the safety space is used and usable by electric utilities.[170]  Although the Commission recognized in the *2011 Order* that joint use agreements were commonly structured as cost sharing arrangements,[171] it nevertheless held that an incumbent LEC should be charged the same pole attachment rate as competitive attachers where it is subject to "comparable" terms and conditions, thereby

---

[162] *2001 Order on Reconsideration,* 16 FCC Rcd 12103, 12130, para. 51.

[163] *2011 Order*, 26 FCC Rcd at 5320, para. 180 & nn.558-59.  The Commission rejected the argument, which Duke advances here, that the electric utilities should not bear the cost of the safety space because that space "is only necessary because of communications attachers."  *Id*. at para. 180 & n.558 (rejecting argument by Florida IOUs); *see* Duke PFR Reply at 5 ("Without communications attachments, this [40 inches] of space is unnecessary on [Duke]'s poles.").

[164] *2011 Order*, 26 FCC Rcd at 5336, para. 217.

[165] Petition at 10.

[166] *2000 Fee Order*, 15 FCC Rcd at 6468, para. 22.

[167] *Id.* at 6467-68, para. 22.  Even if an individualized factual determination were appropriate, record evidence showing that Duke mounts street lights in the safety space supports the conclusion that the space is usable by Duke and that it can, and does, use the safety space.  *See* Freeburn Answer Decl. at 8-9, para. 18; Burlison Answer Decl. at 4, para. 9; Reply at 6 & n.27.  It makes no difference that Duke's use of the safety space is only "occasional" or not "necessary for proper installation" of the lights.  Reply at 6 & n.27.  The safety space is usable by Duke.  *Cf. Adoption of Rules for the Regulation of Cable Television Pole Attachments*, Memorandum Opinion and Order, 77 FCC 2d 187, 190-91, para. 10 (1980) (rejecting argument that because electric utilities do not use the safety space for streetlights, transformers, and the like "as a matter of common practice," the space should not be considered usable space, noting that "[t]he issue is not whether the space is actually *used*, but whether it is *usable*") (emphasis in the original).

[168] *See* Petition at 9 (arguing that "but for the JUA, [Duke] would not have built safety space into its pole network in its overlapping service territory with AT&T").

[169] Duke PFR Reply at 5.

[170] *2011 Order*, 26 FCC Rcd at 5320, para. 180 & nn.558-59.

[171] *Id.* at 5334 n.651.

allowing an incumbent LEC to show it should be charged the New Telecom Rate.[172]  Further, the Commission expressly recognized in the *2011 Order* that "our regulation of rates for attachments by incumbent LECs could reduce the amount of costs that utilities are able to recover …. "[173]  For all of these reasons, we deny Duke's request to reconsider the Bureau's ruling that Duke may not charge AT&T for the safety space.

## IV.    WE DENY AT&T'S APPLICATION FOR REVIEW AND GRANT AT&T'S REQUEST FOR CLARIFICATION

45.    In the *Order*, the Bureau held that Duke had demonstrated with clear and convincing evidence that AT&T receives benefits under the JUA that materially advantage it over competitive attachers on the same poles.  The Bureau therefore concluded that under section 1.1413(b) of our rules as revised in the *2018 Order*, AT&T is entitled to a rate, as of January 1, 2020, that does not exceed the Old Telecom Rate.[174]  The Bureau then resolved disputed matters regarding the proper calculation of the Old Telecom Rate, including the average number of attachers on Duke's poles.[175]  In the ordering clause, the Bureau directed the parties, *inter alia*, to negotiate a new reciprocal joint use agreement with rates for AT&T's attachments that do not exceed the Old Telecom Rate.[176]  AT&T's Application for Review challenges the Bureau's ruling that Duke demonstrated that AT&T receives material advantages under the JUA,[177] as well as the decision to accept Duke's survey evidence showing the average number of attachers.[178]  In addition, AT&T asks the Commission to clarify that the parties only need to amend the JUA to include the new lawful rate provision and need not negotiate an entirely new agreement.[179]  As explained below, we find that AT&T's challenges to the *Order* lack merit; however, we grant AT&T's request for clarification.

### A.    The Bureau Reasonably Determined that the JUA Provides AT&T with Benefits that Give Material Advantages Over Competitive Attachers on the Same Poles

46.    The Bureau properly concluded that the JUA collectively provides AT&T with unique benefits that materially advantage AT&T over other telecommunications attachers on the same poles.[180]

---

[172] *See id.* at 5336, para. 217; *see also 2018 Order*, 33 FCC Rcd at 7769, para. 126 (adopting rebuttable presumption that "the incumbent LEC should be charged no higher than the pole attachment rate for telecommunications attachers calculated in accordance with [the New Telecom Rate in] section 1.1406(e)(2) of the Commission's rules").

[173] *2011 Order*, 26 FCC Rcd at 5304, para. 149.

[174] *Order*, 36 FCC Rcd at 13690-700, paras. 15-35; 47 CFR § 1.1413(b).

[175] *Order*, 36 FCC Rcd at 13707-09, paras. 48, 52-53.

[176] *Id.* at 13715, para. 64.

[177] *See* Application at 4-16.  AT&T also argues that the Bureau erred in limiting the New Telecom Rate presumption's reach to the period after January 1, 2020, the date the JUA automatically renewed.  Application at 4 n.12 (arguing that "[b]y regulation, the presumption applies to an entire 'complaint proceeding[ ] challenging utility pole attachment rates' under a newly renewed JUA" (citing  47 CFR § 1.1413(b)).  AT&T is wrong.  As discussed above, the *2018 Order* expressly stated that the New Telecom Rate presumption "only appl[ies], as it relates to [pre-*2018 Order* agreements], upon renewal of those agreements" following the *2018 Order*'s March 11, 2019 effective date.  *See 2018 Order*, 33 FCC Rcd at 7770, para. 127.  Thus, the *2011 Order* governed the parties' JUA until that agreement automatically renewed on January 1, 2020.  *Id.*, 33 FCC Rcd at 7770, para. 127 n.478.  *See supra* para. 10; *see also Bellsouth Telecomms., LLC v. Florida Power & Light*, Proceeding No. 19-187, Order on Review, 2022 WL 2104259, at *3, paras. 8-9 (2022) (*AT&T v. FPL Order on Review*).

[178] Application at 19-20.

[179] *Id.* at 21-22.  As discussed below, AT&T also contends that Duke must justify any "upward variation from the new telecom rate" "based on relevant costs."  *Id.* at 17.

[180] *Order*, 36 FCC Rcd at 13700, para. 35.

As an initial matter, AT&T argues that Duke did not prove that any "advantage" was material because it failed to calculate the monetary value of each advantage discussed in the *Order*.[181]  As Duke points out, however, the *2018 Order* does not require it to calculate a precise value for each such AT&T advantage.[182]  Indeed, as discussed above, the Commission recently affirmed that rule 1.1413 does not require a party in a pole attachment complaint proceeding "to quantify the value of individual benefits an incumbent LEC receives under a joint use agreement."[183]  As explained below, we find the Bureau properly considered and analyzed the material advantages AT&T receives under the JUA.

47.       *Guaranteed Access and the Right to Remain on the Poles Post Termination*.  The Bureau correctly found that AT&T receives advantages over competitive attachers because the JUA requires Duke to reserve and maintain space for AT&T on Duke poles and bars Duke from removing AT&T facilities from the poles upon termination of the JUA.[184]  AT&T's competitors, by contrast, are not guaranteed space on any pole to which they are not already attached and are required to remove all attachments upon termination.[185]

48.       AT&T argues that the pole access benefits the JUA provides are "wholly offset" by the statutory right of access accorded competitive attachers.[186]  In fact, AT&T claims it is at a "material *disadvantage* compared to AT&T's competitors, which enjoy broader and permanently guaranteed statutory access to Duke Progress's poles."[187]  We disagree.  As we recently explained, an analysis of material advantages is limited to a comparison of the contractual rights afforded the incumbent LEC and those afforded other attachers.[188]  In any event, there are limits to the statutory right of access of AT&T's competitors under section 224(f) of the Act; a utility may deny access "where there is insufficient

---

[181] Application at 6-7 & n.27 (citing *Order*, 36 FCC Rcd at 13705-06, paras. 43, 45 n.152); AT&T AFR Reply at 3.  Although the Bureau was not persuaded by Duke's attempt to calculate the precise dollar value of individual benefits, it nevertheless found that AT&T receives valuable material advantages that are not afforded to competitive LEC or cable attachers on the same poles.  *See*, *e.g.*, *Order*, 36 FCC Rcd at 13700, 13703-04, paras. 35, 41.

[182] *See* Duke AFR Opposition at 19-20; *see also Verizon Maryland Recon Order*, 2022 WL 990572, at **5-6, paras. 13-16 (explaining that under either the *2011 Order* or the *2018 Order*, the Commission does not require either party to quantify the value of individual benefits that the incumbent LEC receives under a JUA); *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *3, para. 9 (noting that the *2011 Order* does not require a utility to justify a rate higher than the New Telecom Rate with quantified costs it incurs).

[183] *Verizon Maryland Recon Order*, 2022 WL 990572, at *5, para. 14.  We also reject AT&T's assertion that the Bureau's finding that AT&T enjoys benefits that materially advantage it over competitive attachers was based on "immutable characteristics" of incumbent LECs.  According to AT&T, these benefits are AT&T's right to guaranteed access to Duke's poles, its right to maintain existing attachments on Duke poles after the JUA's termination, and its right to occupy the lowest position on the poles.  *Id.*  As discussed below, each of these benefits are based on the express terms of the JUA, not on any "immutable" traits of incumbent LECs, and Commission precedent supports the Bureau's findings regarding each of the benefits.

[184] *Order*, 36 FCC Rcd at 13691-92, 13694-95, paras. 17-19, 21-23.

[185] *Id.* at 13691-92, 13694, paras. 17-19, 21; *see also Verizon Maryland*, 35 FCC Rcd at 13612, para. 20 (an incumbent LEC is materially advantaged under a joint use agreement where, *inter alia*, it is guaranteed space on the utility's poles); *Verizon Maryland Recon Order*, 2022 WL 990572, at *3, para. 9 & n.33 (citing 47 U.S.C. § 224(f)(2) and 47 CFR § 1.1403(a)); *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *4, para. 11; *2018 Order*, 33 FCC Rcd at 7771, para. 128 (noting that "material benefits may include . . . "[g]uaranteed space on the pole") (quoting *2011 Order*, 26 FCC Rcd at 5334, para. 216 n.654).

[186] Application at 5-6.

[187] *Id.* at 8.

[188] *See Verizon Maryland Recon Order*, 2022 WL 990572, at **2-3, paras. 6-8; *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *4, para. 12.

capacity and for reasons of safety, reliability and generally applicable engineering purposes."[189]  In contrast, under the JUA, Duke poles must have sufficient capacity to accommodate AT&T's attachments and replace insufficiently tall or strong poles.[190]  As a result, AT&T, unlike its competitors, may not be precluded from offering service to customers because there is no space on a pole for its attachments.[191]

49.    We are also unpersuaded by AT&T's assertion that it is disadvantaged by a provision in the JUA allowing either party to terminate the other party's right to make additional attachments and thereby deny it access to future pole lines.[192]  Because this right is reciprocal, and Duke needs to attach to AT&T's new pole lines, Duke is unlikely to terminate AT&T's access to new poles and has, in fact, refrained from doing so for more than two decades.[193]  Accordingly, consistent with the Commission's conclusions in *Verizon Maryland*, we affirm the Bureau's finding that AT&T's guaranteed access to Duke poles, and its right to maintain existing attachments following termination of the JUA, materially advantage AT&T.[194]

50.    *The Ability to Use Additional Space on Duke Poles*. The Bureau found that AT&T's "ability to add more attachments, as needed, without additional expense, is an advantage accorded AT&T but not its competitors."[195]  AT&T argues that this finding is mistaken because competitors' license

---

[189] 47 U.S.C. § 224(f)(2); *see also Verizon Maryland Recon Order*, 2022 WL 990572, at *3, para. 9 (noting that "section 224(f)(2) allows [the utility] to deny access to a pole that is not tall enough or strong enough to accommodate a new attachment" and concluding that "[e]ven if it were appropriate to compare the statutory access rights of Verizon's competitors[] against Verizon's contractual rights, such a comparison would show those statutory rights do not materially advantage Verizon's competitors and do not collectively outweigh the advantages Verizon enjoys under the JUA"); *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *4, para. 12.

[190] *See* JUA, Art. VII ([W]henever any Jointly Used pole . . . is insufficient in size or strength for both the existing Attachments and the proposed additional Attachments by the Owner or Licensee … the Owner shall promptly replace such pole with a new pole of the necessary size or strength . . . .").

[191] *See Verizon Maryland Recon Order*, 2022 WL 990572, at *3, para. 9; *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *4, para. 12.  We reject AT&T's attempt to compare its contractual right to pole replacement with Duke's voluntary practice to replace poles for some competitors. Application at 9 (arguing that "in those few cases where [Duke] can lawfully deny CLECs and cable companies access due to insufficient pole capacity, [Duke] has, in fact, replaced its poles so they can attach"). As the Commission held in *AT&T v. FPL*, a "'voluntary practice' is not the equivalent of a contractual obligation, and the new attacher must pay the costs associated with the pole replacement." *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *4, para. 12 n.46.

[192] Application at 8-9 (citing JUA, Arts. II, XVII.B) (arguing the "JUA allows [Duke] to deny AT&T access to poles [Duke] deems unsuitable for joint use and to terminate—at any time and for any reason—AT&T's ability to deploy facilities on future [Duke] pole lines").

[193] *Accord Verizon Maryland Recon Order*, 2022 WL 990572, at *3, para. 9 ("Because Potomac Edison needs to attach to Verizon's new poles, it is unlikely to terminate the JUA and deny Verizon access to new poles and has, in fact, refrained from doing so for more than 60 years."). We also find unpersuasive AT&T's assertion that it is disadvantaged by JUA Article II, which allows either party to exclude poles from joint use that it deems unsuitable for that purpose. Application at 8-9 & n.39.  Article II provides that a party may exclude poles that "should be restricted for reasons of safety or economy or its own use" and poles that "carry or are intended to carry, circuits or equipment" that make such poles "undesirable for proper rendering of its service." AT&T does not cite any evidence that this provision has been, or is likely to be, invoked to AT&T's detriment and this possibility appears remote, given the reciprocal nature of the provision. Further, some of the poles subject to Article II appear to be poles to which Duke could deny competitive attachers access under section 224(f)(2). *See* 47 U.S.C. § 224(f)(2) (utility may deny access "where there is insufficient capacity and for reasons of safety, reliability and generally applicable *engineering* purposes") (emphasis added); *see also Verizon Maryland Recon Order*, 2022 WL 990572, at *2 n.23; *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *4, para. 12 n.44.

[194] *Verizon Maryland*, 35 FCC Rcd at 13615, para. 20; *Verizon Maryland Recon Order*, 2022 WL 990572, at *3, para. 9.

[195] *Order*, 36 FCC Rcd at 13693-94, para. 20.

agreements, like the JUA, place no restriction on the amount of space an attacher can occupy.[196]  AT&T overlooks the fact that while competitive attachers "pay a per attachment rate premised upon a single foot of occupancy"[197] and pay more if they occupy more than one foot of space,[198] the rate AT&T pays under the JUA is not based on the amount of space it occupies, and thus it can expand the space it occupies on a pole at no additional cost.[199]  Further, as discussed below, AT&T can readily expand into available space on the pole because, unlike its competitors, it does not need to obtain prior approval from Duke or pay a permitting fee when it places a new attachment on a Duke pole.  Because this ability to expand at no additional cost provides AT&T with an advantage over competitive attachers, we affirm the Bureau's finding.

51.    *Scheduled Costs Rather than Actual Costs for Pole Replacements*.  The Bureau correctly concluded that the JUA provides AT&T with a budgeting and planning advantage over its competitors because it includes a schedule of pole replacement costs that AT&T can rely on when it has to pay to replace a Duke pole, whereas competitive attachers must wait for an estimate or invoice to learn the cost of each pole replacement job.[200]  AT&T does not dispute this benefit.  Instead, it argues that Duke failed to prove there was a cost difference between the scheduled costs AT&T pays and the actual costs its competitors pay.[201]  This argument misses the point.  Although Duke provided evidence purporting to demonstrate that the actual cost that competitors pay for a pole replacement is substantially higher than the scheduled cost in the JUA,[202] the Bureau made no finding on the dollar difference between actual and scheduled costs due to a lack of information in the record about whether equipment transfer costs were included in Duke's estimate of the average cost savings that advantage provides.[203]  The Bureau nevertheless found that the JUA benefits AT&T by allowing it to determine, in advance, the cost of needed pole replacements without having to request estimates and invoices from Duke for each pole that needs replacement, as its competitors must do.  We affirm that undisputed finding.

52.    *No Permitting Fees or Prior Approval for Attachments*.  We likewise affirm the Bureau's finding that the JUA benefits AT&T by allowing it to place attachments on Duke poles without seeking prior approval or paying a permitting fee, as competitive attachers are required to do.[204]  The Commission has recognized that material benefits may include no advance approval to attach to a utility's poles.[205]  AT&T attempts to dispute this benefit by arguing that it incurs the cost of performing permitting work itself.[206]  But even if AT&T incurs the cost of compiling the type of information that competitors include on a permit application, it still enjoys the significant advantage of immediate access to Duke's poles without having to submit an application, pay a fee, and then wait for Duke to either approve the

---

[196] Application at 10-12.

[197] *Order*, 36 FCC Rcd at 13693, para. 20 n.62 (citing Duke Initial Brief at 11 & n.47).

[198] *See Order id.* at 13693-94, para. 20 & n.62; *accord* Duke AFR Opposition at 9-11.

[199] JUA, Art. III.A at 3; *Order*, 36 FCC Rcd at 13693-94, para. 20.

[200] *Order*, 36 FCC Rcd at 13695-96, paras. 24-27.

[201] Application at 12.

[202] *Order*, 36 FCC Rcd at 13695,  para. 24 & nn.73-75 (citing record).

[203] *See supra* para. 35.  *Order*, 36 FCC Rcd at 13696, para. 26 ("Because the record does not indicate the extent to which equipment transfer costs are included in Duke's average cost estimate or in the Exhibit B scheduled cost for a pole replacement, we make no finding with respect to Duke's claim that the average cost advantage to AT&T is {[          ]}.").

[204] *Order*, 36 FCC Rcd at 13696, para. 26.

[205] *See AT&T v. FPL Order on Review*, 2022 WL 2104259, at *6, para. 17; *2018 Order*, 33 FCC Rcd at 7771, para. 128.

[206] Application at 12 & n.58.

application, conditionally approve it subject to make-ready requirements, or deny it.[207]  As the Commission has observed, when the attacher is in control of the process, the process almost certainly takes less time and costs less money.[208]  AT&T thus enjoys the substantial benefit of controlling the pole attachment process.

53.      *Lowest Position on the Poles*.  AT&T argues that, contrary to the Bureau's finding, the location of its existing attachments at the bottom of the communications space is a competitive disadvantage.  We disagree.  First, we reject AT&T's suggestion that its attachments occupy the bottom position due to "history rather than affirmative decision-making."[209]  The record shows that the JUA ensures AT&T's right to occupy the bottom position of the poles[210] and that AT&T never sought to abandon that right.[211]  The Commission has recognized that a preferential position on the poles can be a material advantage.[212]  AT&T nonetheless asserts that the bottom position on the poles is somehow a disadvantage due to the risk of vandalism or other damage and the purported higher costs when transferring facilities to a replaced or relocated pole.[213]  The Bureau found, correctly, that these asserted disadvantages were "mostly unsupported" by evidence[214] and concluded that on balance AT&T enjoyed "significant competitive benefits . . . resulting from its lowest position" on the poles.[215]  The record shows that the benefits to AT&T include ease of access to AT&T's attachments without needing to work

---

[207] *See* Freeburn Answer Decl. at 10, para. 20.

[208] *See AT&T v. FPL Order on Review*, 2022 WL 2104259, at *6, para. 17; *see also 2018 Order*, 33 FCC Rcd at 7711-19, paras. 13-24 (placing the attacher in control of the surveys, notices, and make-ready work required for new attachments so that attachment is faster and cheaper).  We are not persuaded by AT&T's assertion that it performs work on Duke poles "under competitively *disadvantageous* conditions."  Application at 12.  In support, AT&T points to the limited circumstance where it needs other attachers to move or transfer their facilities on Duke poles so that AT&T can attach its facilities.  According to AT&T, it is subject to "excessive delays" with "limited remedies" if the other attachers do not promptly complete their work, whereas "AT&T's competitors are statutorily guaranteed *timely* access" and "are protected by the Commission's one-touch make-ready option, make-ready deadlines, and self-help remedies."  *Id*. at 13-14.  Even if it were appropriate to compare AT&T's contractual rights with the statutory and regulatory rights of competitive attachers—and it is not, as discussed above—AT&T's right to make attachments to Duke poles without prior approval is much broader than the one-touch make-ready option and "self-help" rights that our rules grant to competitive attachers in certain circumstances.  *See* 47 CFR § 1.1411(e)-(j).  AT&T's argument also fails because AT&T does not sufficiently explain what "delays" it allegedly suffers when other attachers must move or transfer their facilities to accommodate AT&T, and whether the amount of time other attachers take for this work exceeds the time allowed for such work under the Commission's timeline or one-touch make-ready rules.

[209] Application at 14-15.

[210] *See* 1977 JUA, Art. I.A.2 (allocating lowest usable space on pole to AT&T); JUA, Art. III.B at 3 ("[A]ll existing Attachments to poles jointly used by the parties shall continue to exist in their current condition as of the date of this Agreement and nothing contained herein shall be construed as requiring either party to remove, transfer, or rearrange any such existing Attachments.").

[211] *See, e.g.*, Freeburn Answer Decl. at 10, para. 19 (attesting that "not once in my nearly 17 years as the manager of the joint use department for Progress Energy and Duke Energy has AT&T ever asked . . . to assume a higher position on the pole, or to avoid what it now contends to be an 'unfavorable' location").  The record shows that AT&T's position on poles was the product of a commercial negotiation that resulted in the JUA.  *See Order*, 36 FCC Rcd at 13697-98, para. 31 & nn.92-93 (discussing 1977 JUA, Art. I.A.2 and JUA, Art. III.B at 3).

[212] *2018 Order*, 33 FCC Rcd at 7771, para. 128.  *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *5, para. 14.

[213] Application at 14.

[214] *Order*, 36 FCC Rcd at 13698-99, para. 33 & n.103.

[215] *Id.* at 13698-99, para. 33.

through the lines of other attachers.[216]  And as the Bureau also observed, the JUA provides AT&T with "a consistent and predictable space on each pole in a position of its choosing."[217]  Accordingly, we affirm the Bureau's determination that the lowest position is a material advantage.[218]

54.    Having determined that the JUA provides benefits that materially advantage AT&T over other attachers, the Bureau found, correctly, that Duke could charge AT&T a rate no greater than the Old Telecom Rate for the timeframe covered by the *2018 Order*.[219]  We reject AT&T's assertion that "even if an ILEC receives net material competitive benefits" "[a]ny upward variation from the new telecom rate must be justified based on relevant costs."[220]  For the reasons discussed in our recent order,[221] Duke's right to charge a rate no higher than the Old Telecom Rate is not conditioned on submitting information about the cost of providing the advantages AT&T receives under the JUA.

**B.    The Bureau Properly Relied on Duke's Comprehensive Survey to Determine the Rate Input for the Average Number of Attachers**

55.    AT&T challenges one aspect of the Bureau's ruling regarding the calculation of the Old Telecom Rate.  Specifically, AT&T objects to the Bureau's finding on the average number of attachers per pole (an input to the Old Telecom Rate).[222]  The Commission has established presumptions for the average number of attachers in urban and non-urban areas,[223] which may be rebutted by "probative direct

---

[216] *See Order*, 36 FCC Rcd at 13698, para. 32 & nn.95, 97; Freeburn Answer Decl. at 9, para. 19; Burlison Answer Decl. at 7, para. 17.

[217] *Order*, 36 FCC Rcd at 13698-99, para. 33.  To put it plainly, AT&T's right in this regard is effectively a reserved front row parking space, with the adjacent space kept empty; that is, AT&T's space on the poles is more convenient, easier to locate, and safer in that no attacher is below.  This finding is also consistent with the Bureau's findings in *AT&T v. FPL I*, in which the Bureau determined the lowest position on the pole enables "employees [to] work in a safer area of the pole, [and] identify and access AT&T attachments more easily . . . . "  *See AT&T v. FPL I*, 35 FCC Rcd at 5329, para. 14; *see also id.* at 5329, para. 14 n.59 (noting AT&T admitted in that case that attaching at the lowest point "eliminates confusion," and that AT&T had never requested to attach at any other location); *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *5, para. 14.

[218] We reject AT&T's claim that although Duke had the burden to demonstrate that AT&T enjoys material advantages over its competitors, the Bureau improperly shifted the burden to AT&T.  *See* Application at 7, 11, 15.  No such burden shifting occurred.  The Bureau recognized that "[t]he *2018 Order* established a presumption that AT&T may be charged a rate no higher than the New Telecom Rate for agreements entered into or renewed after March 11, 2019, unless Duke demonstrates 'with clear and convincing evidence that [AT&T] receives benefits under [the JUA] that materially advantages [it] over other telecommunications carriers or cable television systems providing telecommunications services on the same poles.'"  *Order*, 36 FCC Rcd at 13690, para. 15 (internal citations omitted).  The Bureau then explained in detail how the record clearly and convincingly demonstrates that AT&T receives material advantages over other competitive attachers.  *See id.*, 36 FCC Rcd at 13690-99, paras. 16-33; *see also* Duke AFR Opposition at 6-16 (discussing the Bureau's findings regarding the advantages Duke demonstrated).  The Bureau's discussion of AT&T's submissions regarding these advantages did not shift the burden, but rather pointed out the extent to which AT&T offered evidence to rebut the facts presented by Duke.

[219] *Order*, 36 FCC Rcd at 13700, para. 35.

[220] Application at 17; *see id.* at 16-18.

[221] *Verizon Maryland Recon Order*, 2022 WL 990572, at **4-6, paras. 12-16; *id.* at *6, para. 16 (noting that, although the Commission made the Old Telecom Rate a "hard cap," it did not "require either party to calculate the dollar value of specific advantages provided under a JUA").  *See supra* para. 46.

[222] Application at 19.

[223] *See* 47 CFR § 1.1409(c)*; see also id.* at § 1.1406(d)(2).

evidence."[224]  The Bureau found that Duke had rebutted the rule's presumptions by submitting the results of an audit of all Duke poles to which AT&T is attached.[225]  Notably, AT&T does not challenge the reliability of the audit data Duke submitted.  Rather, AT&T contends that the Bureau should have applied the Commission's presumptions as to the average number of attachers because Duke applies those presumptions in calculating the New Telecom Rate, which it charges competitive attachers who provide telecommunications service.[226]  We disagree, given that we recently rejected that same argument.[227]  As we explained, under the Old Telecom Rate formula, the number of attaching entities has a significant effect on the Old Telecom Rate, but little effect on the New Telecom Rate, regardless of whether the Commission's presumptions apply.[228]  Duke thus reasonably decided, in setting the rate for its competitive attachers, to rely on the Commission's presumption as to the average number of attachers rather than expending time and money surveying its poles, since the results of a survey would have only a minimal, if any, effect on the rate.[229]  Accordingly, Duke's application of the Commission's presumptions to calculate the New Telecom Rate does not mean that it must apply the same presumptions to calculate the Old Telecom Rate.[230]

### C.    We Grant AT&T's Request for Clarification

56.    AT&T asks the Commission to clarify that the parties "*only* need to amend the JUA to include the new lawful rate provision—and do not need to negotiate a whole new joint use agreement," claiming the *Order* is ambiguous on this point.[231]  AT&T states that, not only do the parties not need "an entirely new joint use agreement," but the Commission "does not have the authority to order a wholesale revision of the JUA," noting that the Commission's rules allow it to "[t]erminate the unjust and/or unreasonable rate" and "[s]ubstitute in the pole attachment agreement the just and reasonable rate."[232]  Duke, however, argues that the *Order* properly "directs AT&T and [Duke] to 'negotiate a new reciprocal

---

[224] *Amendment of Rules and Policies Governing the Attachment of Cable Television Hardware to Utility Poles*, Report and Order, 2 FCC Rcd 4387, 4394, para. 52 n.27 (1987); *Teleport Commc'ns Atlanta, Inc. v. Georgia Power Co.*, Order on Review, 17 FCC Rcd at 19866, para. 18 n.41.

[225] *Order*, 36 FCC Rcd at 13709, paras. 52-53.

[226] *See* Application at 19.

[227] *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *7, para. 21.

[228] *AT&T v. FPL Order on Review*, 2022 WL 2104259, at *7, para. 21.  *See 2011 Order*, 26 FCC Rcd at 5304-05, paras. 149-51 (adopting cost allocators in the New Telecom Rate formula to be applied where poles have five attaching entities (0.66 percent of cost) or three attaching entities (0.44 percent of cost); *2015 Implementation Recon Order*, 30 FCC Rcd at 13732-33, para. 3 (adopting cost allocators for poles with two attaching entities (0.31 percent of costs) and four attaching entities (0.56 percent of cost)).  *See also* Duke AFR Opposition at 22 (arguing that because the cost allocator in the New Telecom Rate formula essentially "negates the component of the Old Telecom Rate that allocates 2/3 of the unusable space equally among the attaching entities on a pole," the average number of attachers input "is relevant only for purposes of the Old Telecom Rate").

[229] *See AT&T v. FPL Order on Review*, 2022 WL 2104259, at *7, para. 21; Duke AFR Opposition at 22 (asserting that if the average number of attachers per pole "still mattered for purposes of calculating the New Telecom Rate, [Duke] would most certainly use the actual [average] rather than a presumptive value").

[230] *See AT&T v. FPL Order on Review*, 2022 WL 2104259, at *7, para. 21.

[231] Application at 21 (emphasis in original).

[232] *Id.* (quoting 47 CFR § 1.1407(a)(1), (2)).  AT&T proposes that the Commission clarify that "only 'a new reciprocal joint use agreement [*rate provision*] consistent with' [the *Order*] is required."  *Id.* (citing *Order*, 36 FCC Rcd at 13715, para. 64).  It further proposes that the Commission "limit further negotiations by directing the parties to promptly amend the JUA's rate provision to conform to [the *Order*] and ordering Duke Progress to provide AT&T the lawful rate and required refunds without further delay."  *Id.* at 22.

joint use agreement.'"[233]  We grant AT&T's request and clarify that, consistent with section 1.1407(a) of our rules, the parties are required only to modify the JUA to conform to the rulings in the *Order* and in this decision, and the *Order* does not mandate that the parties negotiate a completely new agreement. Should the parties endeavor to negotiate an entirely new agreement, they should bear in mind that our determination that Duke is entitled to charge a rate no higher than the Old Telecom Rate, and not the New Telecom Rate, is premised on the record before us, including the JUA as it currently exists.[234]  Finally, as requested by AT&T, we direct the parties to proceed promptly to amend the JUA consistent with our rulings, and to determine the lawful rate and any required refunds without further delay.[235]

## V.      ORDERING CLAUSES

57.      Accordingly, **IT IS HEREBY ORDERED**, pursuant to sections 4(i), 4(j), 208, 224, and 405 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 208, 224, and 405, and sections 1.104(c), 1.106, 1.720-1.740, 1.1401, 1.1404, 1.1406, 1.1407, and 1.1413 of the Commission's rules, 47 CFR §§ 1.104(c), 1.106, 1.720-1.740, 1.1401, 1.1404, 1.1406, 1.1407 and 1.1413, that Duke's Petition for Reconsideration is **DENIED** for the reasons and to the extent stated herein.

58.      **IT IS FURTHER ORDERED**, pursuant to sections 4(i), 4(j), 5(c), 208, and 224 of the Communications Act, 47 U.S.C. §§ 154(i), 154(j), 155(c), 208, and 224, and sections 1.104(c), 1.115, 1.720-1.740, 1.1401, 1.1404, 1.1406, 1.1407,  and 1.1413 of the Commission's rules, 47 CFR §§ 1.104(c), 1.115, 1.720-1.740, 1.1401, 1.1404, 1.1406, 1.1407 and 1.1413, that AT&T's Application for Review is **DENIED** for the reasons and to the extent stated herein.

59.      **IT IS FURTHER ORDERED**, pursuant to sections 4(i), 4(j), 5(c), 208, and 224 of the Communications Act, 47 U.S.C. §§ 154(i), 154(j), 155(c), 208, and 224, and sections 1.104(c), 1.115, 1.720-1.740, 1.1401, 1.1404, 1.1406, 1.1407,  and 1.1413 of the Commission's rules, 47 CFR §§ 1.104(c), 1.115, 1.720-1.740, 1.1401, 1.1404, 1.1406, 1.1407 and 1.1413, that AT&T's request for clarification is **GRANTED** for the reasons and to the extent stated herein.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[233] Duke AFR Opposition at 23 (quoting *Order*, 36 FCC Rcd at 13715, para. 64).  Duke claims that, "[i]f [it] can recover no more than the Old Telecom Rate for AT&T's attachments, then [Duke] quite literally cannot afford to provide AT&T with the full range of benefits that AT&T currently enjoys under the JUA." *Id.* at 23.  We address Duke's argument regarding the compensatory nature of the Old Telecom Rate elsewhere.  *See supra* para. 15.

[234] Duke correctly notes that the Commission stated in the *2018 Order* that it would "leave it to the parties to negotiate the appropriate rate or tradeoffs to account for" material benefits provided under a joint use agreement.  Duke AFR Opposition at 24 (citing *2018 Order*, 33 FCC Rcd at 7771, para. 128).  Contrary to Duke's suggestion, however, this reference to "trade-offs" does not mean that in negotiations Duke may seek to remove from the JUA all of the material advantages over competitive LEC and cable attachers that the JUA provides to AT&T while demanding a rate that exceeds the New Telecom Rate.  *See* Opposition at 24-25.  Any such effort may prompt the Commission to assess whether the revised JUA, as proposed by Duke, would provide AT&T with material advantages over other attachers that would justify a rate above the New Telecom Rate.

[235] Application at 22.

## STATEMENT OF
## CHAIRWOMAN JESSICA ROSENWORCEL

Re:   *AT&T North Carolina and AT&T South Carolina v. Duke Energy Progress, LLC*,
Proceeding No. 20-293, EB-20-MD-004, Order on Reconsideration and Review
(November 17, 2022)

Thanks to the Bipartisan Infrastructure Law, we now have the largest effort ever to connect everyone, everywhere in this country to high-speed broadband—no matter who they are or where they live. That's because in the United States we are investing $65 billion in network deployment, affordability, and availability. It is nothing less than a generational commitment to connectivity for all.

Now grand plans in Washington are one thing. The real work takes place on the ground. You see it clearly in the jobs and infrastructure that is being built all around us. And when it comes to broadband, this infrastructure often takes the form of fiber optic cable strung from utility poles. Many of these poles are owned by local electric companies and phone companies. But when they are used to deploy broadband, other companies many need access to these facilities.

Congress has long recognized that fair access to these poles is important. Providing this access on fair terms helps all kind of providers build and maintain modern communications networks. That's why Section 224 of the Communications Act gives this agency authority to oversee the rates, terms, and conditions of pole attachments. That also includes the power to adjudicate disputes between pole owners and attachers.

Today we do just that; we resolve a dispute between an electric utility and the local telephone company regarding what is known as a joint use agreement, under which each entity can use the other's poles. The details are complicated, but the message is simple—the Federal Communications Commission stands ready to do what it can to provide certainty so that disputes like these are resolved, poles are accessed, and high-speed networks are built.

For their work on this infrastructure issue, I'd like to thank Lisa Boehley, Michael Carowitz, Loyaan Egal, Michael Engel, Rosemary McEnery, Lisa Saks, and Raphael Sznajder from the Enforcement Bureau; Rick Mallen, Bill Richardson, and Derek Yeo from the Office of General Counsel; Eugene Kiselev, Richard Kwiatkowski, and Kim Makuch from the Office of Economics and Analytics; and Matt Collins, Adam Copeland, and Michael Ray from the Wireline Competition Bureau.